*294 Justice Stevens
announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-B, III, and IV, and an opinion with respect to Part II-A, in which Justice Souter, Justice Ginsburg, and Justice Breyer join.
The principal issue before us is whether the enforcement of a rule prohibiting high school coaches from recruiting middle school athletes violates the First Amendment. We also must decide whether the sanction imposed on respondent for violating that rule was preceded by a fair hearing.
I
Although this case has had a long history, the relevant facts may be stated briefly. The Tennessee Secondary School Athletic Association (TSSAA) is a not-for-profit membership corporation organized to regulate interscholastic sports among its members, which include some 290 public and 55 private high schools in Tennessee. Brentwood Academy is one of those private schools.
Since the early 1950’s, TSSAA has prohibited high schools from using “undue influence” in recruiting middle school students for their athletic programs. In April 1997, Brent-wood’s football coach sent a letter to a group of eighth-grade boys inviting them to attend spring practice sessions. See App. 119. The letter explained that football equipment would be distributed and that “getting involved as soon as possible would definitely be to your advantage.” Ibid. It was signed ‘Tour Coach.” Ibid. While the boys who received the letter had signed a contract signaling their intent to attend Brentwood, none had enrolled within the meaning of TSSAA rules. See id., at 182 (defining “enrolled” as having “attended 3 days of school”). All of the boys attended at least some of the spring practice sessions. As the case comes to us, it is settled that the coach’s pre-enrollment solicitation violated the TSSAA’s antirecruiting rule and that he had ample notice that his conduct was prohibited.
*295 TSSAA accordingly sanctioned Brentwood. After proceeding through two layers of internal TSSAA review, Brentwood brought this action against TSSAA and its executive director in federal court under Rev. Stat. §1979, 42 U. S. C. § 1983. As relevant here, Brentwood made ■ two claims: first, that enforcement of the rule was state action in violation of the First and Fourteenth Amendments; and second, that TSSAA’s flawed adjudication of its appeal had deprived the school of due process of law. The District Court granted relief to Brentwood, but the Court of Appeals reversed, holding that TSSAA was a private voluntary association that did not act under color of state law. We granted certiorari and reversed, holding that the District Court was correct on the threshold issue. Brentwood Academy v. Tennessee Secondary School Athletic Assn., 531 U. S. 288 (2001). On remand, the Sixth Circuit sent the case back to the District Court, which once again ruled for Brentwood. 304 F. Supp. 2d 981 (MD Tenn. 2003). TSSAA appealed, and the Court of Appeals affirmed over one judge’s dissent. 442 F. 3d 410 (2006). The majority held that the antirecruiting rule is a content-based regulation of speech that is not narrowly tailored to serve its permissible purposes. Id., at 420-431. It also concluded that the TSSAA Board improperly considered ex parte evidence during its deliberations, thereby violating Brentwood’s due process rights. Id., at 433-438.
We again granted certiorari, 549 U. S. 1105 (2007), and we again reverse.
II
The First Amendment protects Brentwood’s right to publish truthful information about the school and its athletic programs. It likewise protects the school’s right to try to persuade prospective students and their parents that its excellence in sports is a reason for enrolling. But Brent-wood’s speech rights are not absolute. It chose to join TSSAA, an athletic league and a state actor invested with a *296 three-fold obligation to prevent the exploitation of children, to ensure that high school athletics remain secondary to academics, and to promote fair competition among its members. TSSAA submits that these interests adequately support the enforcement against its member schools of a rule prohibiting coaches from trying to recruit impressionable middle school athletes. Brentwood disagrees, and maintains that TSSAA’s asserted interests are too flimsy and its rule too broad to support what the school views as a serious curtailment of its constitutional rights. Two aspects of the case taken together persuade us that TSSAA should prevail.
A
The antirecruiting rule strikes nowhere near the heart of the First Amendment. TSSAA has not banned the dissemination of truthful information relating to sports, nor has it claimed that it could. Cf. Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U. S. 748 (1976) (striking down a prohibition on advertising prices for prescription drugs). It has only prevented its member schools’ coaches from recruiting individual middle school students. Our cases teach that there is a difference of constitutional dimension between rules prohibiting appeals to the public at large, see 44 Liquormart, Inc. v. Rhode Island, 517 U. S. 484, 495-500 (1996), and rules prohibiting direct, personalized communication in a coercive setting.
Ohralik v. Ohio State Bar Assn., 436 U.S. 447 (1978), nicely illustrates the point. In Ohralik, we considered whether the First Amendment disabled a state bar association from disciplining a lawyer for the in-person solicitation of clients. The lawyer argued that under our decision in Bates v. State Bar of Ariz., 433 U. S. 350, 384 (1977), which invalidated on First Amendment grounds a ban on truthful advertising relating to the “availability and terms of routine legal services,” his solicitation was protected speech. We rejected the lawyer’s argument, holding that the “in-person *297 solicitation of professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services, let alone with forms of speech more traditionally within the concern of the First Amendment.” 436 U. S., at 455. We reasoned that the solicitation ban was more akin to a conduct regulation than a speech restriction:
“ ‘[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.’ Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers’ threats of retaliation. for the labor activities of employees____ Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.” Id., at 456 (citations omitted).
Drawing on these examples, we found that the “[i]n-person solicitation by a lawyér of remunerative employment is a business transaction in which speech is an essential but subordinate component,” id., at 457, the prohibition of which raised few (if any) First Amendment problems.
Ohralik identified several evils associated with direct solicitation distinct from the harms presented by conventional commercial speech. Direct solicitation “may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection,” ibid.; its goal “may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking,” ibid.; and it short circuits the “opportunity for intervention *298 or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual,” ibid. For these reasons, we concluded that in-person solicitation “actually may disserve the individual and societal interest, identified in Bates, in facilitating ‘informed and reliable decisionmaking.’ ” Id., at 458 (quoting Bates, 433 U. S., at 364).
We have since emphasized that Ohralik’s “narrow” holding is limited to conduct that is “ ‘inherently conducive to overreaching and other forms of misconduct.’” Edenfield v. Fane, 507 U. S. 761, 774 (1993) (quoting Ohralik, 436 U. S., at 464); see also Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U. S. 626, 641 (1985) (emphasizing that Ohralik involved a “practice rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud”). And we have not been chary of invalidating state restrictions on solicitation and commercial advertising in the absence of the acute risks associated with in-person legal solicitation. See Edenfield, 507 U. S., at 775 (striking down a restriction on in-person solicitation by accountants because such solicitation “poses none of the same dangers” identified in Ohralik)', Zauderer, 471 U. S., at 639-647 (invalidating a restriction on truthful, nondeceptive legal advertising directed at people with specific legal problems); Shapero v. Kentucky Bar Assn., 486 U. S. 466, 472-478 (1988) (overturning a blanket proscription on all forms of legal solicitation). In our view, however, the dangers of undue influence and overreaching that exist when a lawyer chases an ambulance are also present when a high school coach contacts an eighth grader.
After all, it is a heady thing for an eighth-grade student to be contacted directly by a coach — here, “Your Coach”— and invited to join a high school sports team. In too many cases, the invitation will come accompanied with a suggestion, subtle or otherwise, that failure to accept will hurt the student’s chances to play high school sports and diminish the odds that she could continue on to college or (dream of *299 dreams) professional sports. Cf. App. 119 (“I do feel that getting involved as soon as possible would definitely be to your advantage”).[1] Such a potent entreaty, playing as it does on youthful hopes and fears, could well exert the kind of undue pressure that “disserve[s] the individual and societal interest ... in facilitating ‘informed and reliable decision-making.’” Ohralik, 436 U. S., at 458. Given that TSSAA member schools remain free to send brochures, post billboards, and otherwise advertise their athletic programs, TSSAA’s limited regulation of recruiting conduct poses no significant First Amendment concerns.
B
Brentwood made a voluntary decision to join TSSAA and to abide by its antirecruiting rule. See Brentwood, 531 U. S., at 291 (“No school is forced to join”); cf. Grove City College v. Bell, 465 U. S. 555, 575 (1984). Just as the government’s interest in running an effective workplace can in some circumstances outweigh employee speech rights, see Connick v. Myers, 461 U. S. 138 (1983), so too can an athletic league’s interest in enforcing its rules sometimes warrant curtailing the speech of its voluntary participants. See Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563, 568 (1968) (holding that the scope of a government employee’s First Amendment rights depends on the “balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees”); see also Board of Comm’rs, Wabaunsee Cty. v. Umbehr, 518 U. S. 668, 679 (1996) (“eschewing]” a formal approach to determining which contractual relationships call for the application of Pickering balancing). *300 This is not to say that TSSAA has unbounded authority to condition membership on the relinquishment of any and all constitutional rights. As we recently emphasized in the employment context, “[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.” Garcetti v. Ceballos, 547 U. S. 410, 419 (2006). Assuming, without deciding, that the coach in this case was “speaking as [a] eitize[n] about matters of public concern,” ibid., TSSAA can similarly impose only those conditions on such speech that are necessary to managing an efficient and effective state-sponsored high school athletic league.
That necessity is obviously present here. We need no empirical data to credit TSSAA’s commonsense conclusion that hard-sell tactics directed at middle school students could lead to exploitation, distort competition between high school teams, and foster an environment in which athletics are prized more highly than academics. See Paris Adult Theatre I v. Slaton, 413 U. S. 49, 60 (1973). TSSAA’s rule discourages precisely the sort of conduct that might lead to those harms, any one of which would detract from a high school sports league’s ability to operate “efficiently and effectively.” Garcetti, 547 U. S., at 419. For that reason, the First Amendment does not excuse Brentwood from abiding by the same antirecruiting rule that governs the conduct of its sister schools. To hold otherwise would undermine the principle, succinctly articulated by the dissenting judge at the Court of Appeals, that “[h]igh school football is a game. Games have rules.” 442 F. 3d, at 444 (opinion of Rogers, J.). It is only fair that Brentwood follow them.
Ill
The decision to sanction Brentwood for engaging in prohibited recruiting was preceded by an investigation, several meetings, exchanges of correspondence, see App. 120-123 *301 (fax from Brentwood’s coach to TSSAA’s executive director); id., at 124-127 (memorandum from director to Brentwood’s headmaster); id., at 128-133 (letter from the headmaster responding to the director’s memorandum); id., at 204-211 (letter from TSSAA director to headmaster with further questions); id., at 212-229 (responsive letter from Brent-wood’s headmaster), an adverse written determination from TSSAA’s executive director, id., at 238-244, a hearing before the director and an advisory panel composed of three members of TSSAA’s Board of Control, see id., at 254-258, and finally a de novo review by the entire TSSAA Board of Directors, see id., at 269-271. During the investigation, Brentwood was notified of all the charges against it. At each of the two hearings, Brentwood was represented by counsel and given the opportunity to adduce evidence. No evidence offered by Brentwood was excluded.
Brentwood nevertheless maintains that its due process rights were violated when the full TSSAA Board, during its deliberations, heard from witnesses and considered evidence that the school had no opportunity to respond to. Some background is necessary to understand the claim. One of the matters under investigation was whether an Amateur Athletic Union basketball coach named Bart King had pushed talented middle school students — ^including a basketball star named Jacques Curry — to attend Brentwood. See, e. g., id., at 220,222 (letter from Brentwood’s headmaster discussing the allegation that King had told Curry that if he attended Brentwood, he “would probably have a car when he is in the tenth grade”). Brentwood consistently maintained that King had no affiliation with the school and no authority to act on its behalf. See, e. g., id., at 221-222. Nevertheless, the initial decision by TSSAA’s executive director, as well as the subsequent decision by the director and the advisory panel, declared Curry (as well as several other players) ineligible to play for Brentwood. See id., at 243 (blanket ineligibility), 255 (ineligibility for varsity sports).
*302 As it had in earlier stages of the case, in Brentwood’s final appeal to the TSSAA Board, the school offered live testimony from Curry and an affidavit from King denying the alleged recruiting violations. See id., at 264-267 (Curry’s testimony); id., at 261 (listing “Affidavit of Bart King” as an exhibit).[2] Once Curry had testified, Brentwood’s counsel advised the board that King was available to answer any questions, but did not call him as a witness.[3] After reviewing the evidence, the board found that Brentwood had committed three specific violations of its rules, none of which appeared to involve either King or Curry, and it reinstated Curry’s eligibility. Id., at 269-271. As a penalty for the three violations, the board put Brentwood’s athletic program on probation for four years, excluded the boys’ basketball *303 and football teams from tournament playoffs for two years, and imposed a $3,000 fine. Id., at 270.
During its deliberations, the board discussed the case with the executive director who had presided at the earlier proceedings and two TSSAA investigators, none of whom had been cross-examined. The investigators also provided handwritten notes to the board detailing their investigations; Brentwood never received those notes. The District Court found that the consideration of the ex parte evidence influenced the board’s penalty decision and contravened the Due Process Clause. 304 F. Supp. 2d, at 1003-1006. The Court of Appeals accepted that finding, as well as the conclusion that the evidence tainted the fairness of the proceeding. 442 F. 3d, at 433-438. TSSAA now maintains that the lower courts erred.
We agree. Even accepting the questionable holding that TSSAA’s closed-door deliberations were unconstitutional, we can safely conclude that any due process violation was harmless beyond a reasonable doubt. To begin with, it is hard to believe that the King allegations increased the severity of the penalties leveled against Brentwood.[4] But more impor *304 tantly, Brentwood’s claim of prejudice rests on the unsupported premise that it would have adopted a different and more effective strategy at the board hearing had it been given an opportunity to cross-examine the investigators and review their notes. Despite having had nearly a decade since the hearing to undertake that cross-examination and review, Brentwood has identified nothing the investigators shared with the board that Brentwood did not already know.[5] Perhaps that is why Brentwood never explains what a more effective strategy might have looked like. Brentwood obliquely suggests it might have had King testify at the hearing, but it gives no inkling of what his testimony would have added to the proceedings. We are not inclined to speculate on its behalf.
IV
We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.

 When asked at trial about this language from the offending letter, the Brentwood football coach acknowledged that “[i]n some cases” the middle school student is “not going to think that’s optional.” App. 301.

 The District Court's conclusion that “[t]here was no indication from the TSSAA before the final hearing... that the organization was still considering the Bart King allegations” is clearly erroneous. 304 F. Supp. 2d 981, 1004, n. 29 (MD Tenn. 2003); see also 442 F. 3d 410, 435, and n. 20 (CA6 2006) (affirming finding). Brentwood appealed to the full board in part to overturn the ineligibility sanction that had been leveled against Curry and several other players. See App. 255. Because the only justification for declaring Curry ineligible was that King had improperly recruited him to play for Brentwood, the King allegations were obviously at issue. Brentwood understood as much. It otherwise would have been wasted effort for King to submit an affidavit and for Curry to testify.
Similarly, given that Curry testified in some detail about his relationship with King, id., at 264-267, the Court of Appeals incorrectly concluded that the discussion of King was limited to a brief exchange about whether King would testify. See 442 F. 3d, at 435 (“Evidently this was the only discussion of King at the hearing”).

 “[Brentwood’s lawyer]: Any other questions? That’s going to be it for our proof. If I could make just a few concluding remarks.
“By the way, we have Bart King here to answer any questions. And it was our intention to put him on, but I don’t know if you all are interested in extending for five minutes to hear from Bart King or not. He’s here if you want him.
“[TSSAA’s executive director]: No.
“[Brentwood’s lawyer]: No. All right.” App. 267.

 At trial, a board member testified that the board “dropped” the charges relating to King, id., at 347 (testimony of Michael Hammond), which explains why the board restored Curry’s eligibility. The fine, the probationary period, and the playoff suspension had all been imposed at earlier stages of the proceedings, see id., at 243, 255, suggesting that the board was as a practical matter just affirming penalties associated with the remaining recruiting violations. The King allegations appear to have played a negligible role in choosing which penalties to assess.
The District Court drew its contrary conclusion from a single piece of evidence: the board president’s affirmative response dining a deposition to a question about whether the King allegations supported the board’s finding that the recruiting rule had been violated. 442 P. 3d, at 435-436. As the board president clarified at trial, however, while the King allegations were a “ Tactor’ ” in the board’s discussions, the “ “final penalty did not involve Bart King____ [Tjhe final penalty really dealt with the letter from Mr. Flatt.’” Id., at 436. Thinking it a close call, ibid. (“Whether the King issue was actually a factor in the penalties ultimately imposed is *304 far less certain”), the Court of Appeals held that the District Court could credit the board president’s deposition testimony over his subsequent qualification of that testimony. We agree with the dissenting judge below that “so slender an evidentiary reed” cannot support the conclusion that TSSAA violated Brentwood’s procedural rights. Id., at 454 (opinion of Rogers, J.).

 Nor has our independent review of the investigators’ notes unearthed any allegation of misconduct that would have been new to Brentwood. See XV App. in No. 03-5245 etc. (CA6 2006), pp. 4178-4193.