**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CarePartners LLC, limited
liability corporation under the
Laws of the State of Washington
doing business as Alderwood
Assisted Living; CarePartners
Management, limited liability
corporation under the Laws of the
State of Washington doing
business as Alderwood Assisted
Living; Joseph Kilkelly and
Laura Kilkelly, owners of
CarePartners, LLC, individually
and on behalf of their marital
community,
            *Plaintiffs-Appellees,*

       v.

Pat Lashway, Director of
Residential Care of Services for
the Washington State Department
of Social and Health Services
(DSHS) in her individual capacity;
Nancy Tyson, Boarding Home
Enforcement Officer, for
Residential Care Services and
Aging Adult Services for DSHS,
in her individual capacity;
Joyce Stockwell, an employee of
DSHS in her individual capacity;
Robert McClintock, Regional

No. 07-35125

D.C. No.
CV-05-01104-RSL

OPINION

Administrator for DSHS in his individual capacity also known as Bob McClintock; JULIE LORD, Licensing Field Manager for Residential Care Services for DSHS in her individual capacity; KATHRYN WEBB, Lead Field Inspector for Residential Care Services for DSHS in her individual capacity; MARY CORSO, formerly the Fire Marshal for the State of Washington in her individual capacity; ROGER WOODSIDE, Assistant State Fire Marshal for the State of Washington in his individual capacity; ED BORGATTI, Chief Deputy State Fire Marshal for the State of Washington in his individual capacity; MICHAEL STURGEON, Deputy Fire Marshal for the State of Washington in his individual capacity,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
June 5, 2008—Seattle, Washington

Filed September 25, 2008

Before: Ferdinand F. Fernandez and Consuelo M. Callahan, Circuit Judges, and Irma E. Gonzalez, District Judge*

Opinion by Judge Callahan

---

*The Honorable Irma E. Gonzalez, Chief United States District Judge for the Southern District of California, sitting by designation.

**COUNSEL**

Robert M. McKenna, Attorney General for the State of Washington, Olympia, Washington, D. Thomas Wendel (Argued), Assistant Attorney General for the State of Washington, on behalf of defendants-appellants Pat Lashway, *et al*.

Paul A. Lindenmuth, Esq., Law Offices of Ben F. Barcus & Associates, P.L.L.C., Tacoma, Washington, on behalf of plaintiffs-appellees CarePartners, LLC, *et al*.

**OPINION**

CALLAHAN, Circuit Judge:

CarePartners, LLC, CarePartners Management, and Joseph and Laura Kilkelly, as individual owners of the CarePartners entities (collectively, "CarePartners"), sued several employees and representatives of the Washington State Department of Social and Health Services ("DSHS") and the Washington State Fire Marshal's office ("fire marshal") in their individual capacities (collectively, the "State employees") claiming that the State employees engaged in retaliatory enforcement of

state boarding home laws and regulations against CarePartners, which operated boarding homes in Washington State. CarePartners alleged that the State employees retaliated against its facilities, including revocation of one facility's license, in response to Joseph Kilkelly's ("Kilkelly") constitutionally protected speech and petition activities; namely, his critical public speech about DSHS and its interpretations of certain regulations, his lobbying activities in connection with seeking a license from DSHS, and his filing of an administrative appeal as to one of DSHS's regulatory decisions. In this interlocutory appeal, the State employees appeal the district court's denial of their motion for summary judgment on their defense of qualified immunity. Viewing the facts in a light most favorable to CarePartners, and based on circuit precedent, we hold that the State employees are not entitled to qualified immunity. Accordingly, we affirm the district court's denial of summary judgment.

## I. Factual Background

### A. Regulatory background

The State of Washington licenses and regulates boarding homes (i.e., assisted living facilities for the elderly). Wash. Rev. Code §§ 18.20.020(1), 18.20.030. The State has instituted comprehensive regulations covering various aspects of boarding home construction and operation. *See* Wash. Admin. Code §§ 388-78A-2010-2050. These rules are generally enforced by DSHS and its Resident Care Services department ("RCS"), but fire protection standards are enforced by the Washington State Patrol through the director of fire protection (i.e., the fire marshal's office). Wash. Rev. Code §§ 18.20.110, 18.20.130.

In 1995, the state building code council adopted a licensed care facility code ("LC Code") that requires automatic fire sprinklers if the facility has more than sixteen residents or has more than two residents who are non-ambulatory. Wash.

Admin. Code § 51-40-0313.8.2.1 (1998). In response to a 1998 fire at a boarding home, which killed eight residents, the Washington Legislature enacted a program to subsidize the cost of retrofitting older facilities with fire sprinklers. As of 1999, licensed boarding homes could not accept and retain semi- or non-ambulatory residents unless "the boarding home [was] approved by the Washington state director of fire protection to care for semi-ambulatory or nonambulatory residents." Wash. Admin. Code § 388-78A-240(3)(a) (2002). In December 2001, Pat Lashway, as DSHS Director of RCS, sent letters to all boarding home operators indicating what conditions their facilities would have to meet to serve semi- and non-ambulatory residents.[1]

## B.  Kilkelly's acts and enforcement by the State employees

CarePartners operated three boarding homes in the State of Washington: Meridian Hills ("Meridian"), Alderwood Assisted Living ("Alderwood") and Wenatchee Assisted Living ("Wenatchee"). Alderwood and Wenatchee did not have sprinkler systems in place at the time of enforcement. This lawsuit is based on a series of acts through which Kilkelly exercised his rights of speech and petition, which CarePartners alleges led to the State employees' retaliatory enforcement with respect to the Alderwood and Wenatchee facilities.

---

[1]In 2002, the state fire marshal adopted the 1997 Uniform Fire Code, Wash. Admin. Code § 212-12-030(4) (2003), which mandates: "Existing licensed occupancies previously approved by the state fire marshal as in conformance with the standards then in effect shall have their existing use or occupancy continued, provided such continued use is not dangerous to life and is acceptable to the local fire and building officials having jurisdiction." Wash. Admin. Code § 212-12-010(4)(c) (2003).

### 1.  Kilkelly's administrative appeal of the fine against Meridian

In 2002, the Meridian facility received an annual survey by RCS. Dissatisfied with that survey and an associated fine of $300, Kilkelly and CarePartners filed an administrative appeal in early 2003 to challenge the conclusions and results of the survey. CarePartners was critical of DSHS's assessment of the Meridian facility. Administrative hearings took place in January and February of 2003, and the State of Washington Department of Social and Health Services Board of Appeals eventually affirmed most of the administrative decision in DSHS's favor.

### 2.  Kilkelly's lobbying activity

In early February 2003, CarePartners entered into a letter agreement to lease a boarding home in Lakewood, Washington, from owners who had allowed their license to lapse. The lease was contingent on CarePartners's acquisition of a license from DSHS. Kilkelly engaged in an administrative letter campaign with DSHS, and specifically defendants Lashway and Nancy Tyson, over whether to treat CarePartners's application for a license as one related to an existing facility or as an initial facility application, in other words "grandfathering" the facility in under the old code. Concurrently, Kilkelly began lobbying state politicians for assistance in trying to acquire a license on favorable terms so that CarePartners could meet its stated goal of serving low to medium income residents. He contacted several state senators and met with a state representative's aide to discuss his licensing issue and to criticize DSHS. For example, an e-mail to state senators was entitled "Example of DSHS inflexibility in applying the existing rules — choosing control over whats [sic] best for public policy[.]"[2]

---

[2]Kilkelly's affidavit also asserts that when one of CarePartners's facilities was shut down by DSHS and the leasehold transferred to another les-

### 3. The State employees' enforcement action against Wenatchee and Alderwood

On February 2, 2003, a deputy fire marshal inspected Wenatchee and cited it for having too many semi- and non-ambulatory residents in a facility without fire sprinklers. Kilkelly contested those violations by letter. In February 2003, RCS conducted an inspection of Alderwood and found deficiencies related to the number of semi- and non-ambulatory residents present in the facility.

A June 2, 2003 e-mail indicates that DSHS was "planning to take action against Wenatchee" (and possibly Alderwood), and that DSHS wanted to get all concerned " 'on board' and 'all our ducks alined' [sic]." However, internal e-mails sent between June 3, 2003 and June 5, 2003 indicate that the agencies had not yet reached agreement as to how the CarePartners facilities were to be treated under the relevant statutes and regulations with respect to fire sprinkler system requirements and ambulatory issues. One e-mail referred to the issue as "a curve ball." Another read, in part: "OK guys - I found an 'Ah Shit' in the pile."

Unannounced follow-up inspections at Alderwood and Wenatchee were conducted on June 23 and 24, 2003, noting several violations. On June 27, 2003, DSHS imposed immediate conditions on Wenatchee's and Alderwood's boarding home licenses. DSHS's order required both facilities to: (1) discharge all but two semi-ambulatory residents within 30 days; (2) hire staff within 24 hours who would be dedicated to conducting "fire watches 24 hours, 7 days per week"; (3) contact the fire marshal within 24 hours to discuss evacuation plans; and (4) train staff and residents on evacuation plans

---

see, DSHS accommodated the transfer of the license as an existing license, not an initial application for a license. CarePartners contends that this is contrary to how his application for the Lakewood facility was treated by DSHS.

within seven days. On July 3, 2003, Alderwood appealed the decision to the Office of Administrative Hearings.

In or around early July 2003, CarePartners's attorney, Robin Dale, contacted the Attorney General's office and spoke with Assistant Attorney General Cobb, who represented DSHS and Lashway. In Dale's affidavit, she noted that Cobb "gave [her] the distinct impression that Mr. Kilkelly was not one of the Department's favorite people," and that "Mr. Kilkelly was 'known' to the department," a comment Dale remarked was delivered with "negative connotations." Dale further declared that in the following days she called Assistant Attorney General Hoover, who was purportedly involved with Kilkelly's licencing issues. According to Dale, Hoover indicated that " 'Pat (Lashway) is quickly losing patience with Joe [Kilkelly]."

Dale arranged meetings on July 10 and 11, 2003 between Kilkelly, his attorney of record, RCS personnel, and the Assistant Attorney General to discuss the Wenatchee and Alderwood facilities. Kilkelly presented his plans of correction for both facilities on July 10th and 11th. According to Kilkelly's affidavit, this included installation of a sprinkler system at Alderwood. He had concluded "that the meeting had been very positive and that [they] were working towards a resolution" that would prevent Alderwood from closing.

Notably, the record indicates that during this entire period Kilkelly and his attorney were trying to contact DSHS and fire marshal officials to negotiate or discuss installation of fire sprinklers, but that those officials either refused to talk or would not engage in talks. For example, one internal Washington State Patrol e-mail, dated July 3, 2003, stated:

> I took a call from Mr. Kilkelly . . . . While the call went on for awhile [with me dancing like a trained bear to keep from saying anything], his main point was that he would be more than willing to negotiate

> a time frame within which he would guarantee the installation of a sprinkler system[s]. . . . He did spend some time letting me know how absolutely rotten he and his staff were treated by Mike . . . which I apologized for . . . .

Another internal Washington State Patrol e-mail, dated July 14, 2003, stated:

> [Kilkelly's attorney] just short of begged for a return call. He can't get anyone from DSHS to call him back...... [sic] same story I got from Kilkelly. These folks are MORE than ready to install a sprinkler system, and they can't seem to get anyone to talk about that. . . . I'd hate like hell to see the system bust someone who is indicating they want to "make it right" . . . .

On July 11, 2003, Lashway summarily suspended Alderwood's license, stating that the "residents are in imminent threat of harm." The DSHS order also permanently revoked Alderwood's license and halted admissions of new residents in that facility. That same day, a minority interest owner in CarePartners, Tom Tennent, contacted the news media and began generating negative news media about DSHS.

Alderwood immediately filed an administrative appeal of the order and sought an immediate stay of the order in Washington Superior Court. The Superior Court granted a temporary stay of the suspension, but that stay was eventually lifted by the Superior Court and the Washington Court of Appeals.

While the stay was in place, in July 2003, Kilkelly and his attorneys met with representatives of DSHS, the fire marshal's office and Assistant Attorney General Hoover. According to Dale's and Kilkelly's affidavits, the State was unwilling to negotiate unless Kilkelly agreed to new conditions, includ-

ing the allegedly cost-prohibitive condition of hiring fire-fighters as 24-hour fire watchers.

The administrative appeal process continued while Care-Partners pursued the present case in the district court and concluded after the district court denied the State employees' motion for summary judgment on qualified immunity in this case, which is discussed below. CarePartners withdrew its administrative appeal in May 2007, and the Superior Court entered an order dismissing that appeal with prejudice and deeming DSHS's licensing actions final.

## C.   District court proceedings

On June 17, 2005, CarePartners filed a complaint in district court for damages claiming violations of its First Amendment rights to freedom of speech and to petition for a redress of grievances (based on retaliation), violation of due process, and tortious interference with business relationships. After limited discovery, the defendants moved for summary judgment on the grounds that CarePartners's claims were barred by the *Rooker-Feldman* doctrine, and that they were entitled to qualified immunity. The district court held that: (1) Care-Partners's claims were not barred by the *Rooker-Feldman* doctrine; (2) CarePartners's procedural and substantive due process claims failed as a matter of law; and (3) the defendants were not entitled to qualified immunity on the First Amendment retaliation claims. In denying the State employees' motion for summary judgment on their qualified immunity, the district court stated that it would entertain subsequent motions for summary judgment after the completion of discovery.

The State employees filed this appeal, challenging only the district court's decision denying summary judgment on their claim of qualified immunity in connection with the speech and petition-based retaliation claims.

## II.  Jurisdiction, Scope of Review, and Standard of Review

We have jurisdiction over this interlocutory appeal taken from the denial of the State employees' motion for summary judgment on their defense of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059 (9th Cir. 2006) ("As a general rule, interlocutory appeals from determinations of qualified immunity are permissible."). The scope of our review, however, is limited. Specifically, although we may review whether the State employees violated clearly established law based on undisputed facts, we may not consider questions of " 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313, 319-20 (1995);[3] *see also KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008); *Knox v. Sw. Airlines*, 124 F.3d 1103, 1107 (9th Cir. 1997) ("[W]e have jurisdiction over an interlocutory appeal from the denial of qualified immunity where the appeal focuses on whether the defendants violated a clearly established law given the undisputed facts, while we do not have jurisdiction over an interlocutory appeal that focuses on whether there is a genuine dispute about the underlying facts.").[4]

---

[3]The Supreme Court recently announced that although a court in the typical qualified immunity case will adopt the plaintiff's version of the facts at the summary judgment stage, the court need not adopt the plaintiff's alleged facts that are "utterly discredited" by the record. *See Scott v. Harris*, 127 S. Ct. 1769, 1775-76 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Here, however, the State employees have acknowledged the lack of any substantial dispute on the material facts presented by CarePartners, and the concerns raised in *Scott* are not germane.

[4]Despite our and the Supreme Court's previous characterizations of what an appellate court may review in the context of an interlocutory appeal of a district court's denial of qualified immunity as one of "jurisdiction," we use the label "scope of review" here to avoid any confusion inherent to the word "jurisdiction." *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510-11 (2006).

We review de novo the district court's denial of a motion for summary judgment based on qualified immunity. *Kennedy*, 439 F.3d at 1059; *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004). Regarding possible factual disputes, we assume that the version of the material facts asserted by the non-moving party—here, CarePartners—is correct. *KRL*, 512 F.3d at 1189; *see Kennedy*, 439 F.3d at 1059-60.

## III.   Discussion

In analyzing whether a public official is entitled to qualified immunity, we apply the two-part test from *Saucier v. Katz*, 533 U.S. 194 (2001).[5] First, the court asks whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (citing *Saucier*, 533 U.S. at 201). Second, if there is a constitutional violation, the court asks whether the right was clearly established at the time the official acted. *Id.* "To reject a defense of qualified immunity, we must find that 'the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right.' " *Id.* (quoting *Saucier*, 533 U.S. at 202). If the right was not clearly established at the time of the violation, the official is entitled to qualified immunity.[6] *Id.*

---

[5]We note that *Pearson v. Callahan*, 128 S. Ct. 1702 (2008) (No. 07-751), is pending before the United States Supreme Court. In *Pearson*, the Court directed the parties to brief and argue the question: "Whether the Court's decision in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001) should be overruled?"

[6]We have previously expressed the qualified immunity test as both a two-step test and a three-step test. *Inouye*, 504 F.3d at 712 n.6 (citing *Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (characterizing the third step as an inquiry into the reasonableness of the officer's mistake)). As the *Inouye* court noted, however, the third step from *Skoog* appears to be subsumed in the second step as stated in our other decisions and in *Saucier*. *Id.* We use the two-step iteration of the test.

## A.   Constitutional violation

We must first answer the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [officials'] conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201.

### 1.   Retaliation based on Kilkelly's First Amendment activity

The district court identified five acts that Kilkelly alleged led to retaliation by the State employees:

> (1) Kilkelly's pursuit of an administrative appeal of the fine levied against Meridian Hills Assisted Living; (2) Kilkelly's legislative lobbying efforts to acquire a license for the boarding home facility in Lakewood, Washington; (3) Kilkelly's advocacy related to his interpretation of the building codes which would have permitted the Alderwood facility to be grandfathered out of the sprinkler installation requirements; (4) Kilkelly's statement to the press after the license revocation on July 11, 2003; and (5) Kilkelly's pursuit of both administrative review and a court ordered stay of the summary revocation of his license.

These alleged activities fall within the First Amendment's protection of the rights to free speech and to petition for a redress of grievances. Kilkelly's lobbying efforts, advocacy regarding interpretation of the building codes, and his statements to the press are protected by his right to free speech.

[1] In recognizing one's protected interest in commenting on government officials' actions, we have stated that "[i]t is clear that '[s]tate action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.' " *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310,

1314 (9th Cir. 1989) (citation omitted); *see also FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 405 (1984) (Rehnquist, C.J., dissenting) (noting that the right to lobby is constitutionally protected). Kilkelly's alleged acts of seeking administrative review and a court-ordered stay of the revocation of CarePartners's license are protected by his right to petition the government. *See BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (stating that the right to petition extends to all departments of government and that the right of access to the courts is but one aspect of the right of petition); *Soranno's Gasco*, 874 F.2d at 1314 ("The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances.").

**[2]** In *Soranno's Gasco*, we set forth the standard for evaluating whether a regulated entity has established a claim of retaliation based on the exercise of free speech and petition rights. 874 F.2d at 1314-15. A "plaintiff alleging retaliation for the exercise of constitutionally protected rights must initially show that the protected conduct was a 'substantial' or 'motivating' factor in the defendant's decision." *Id.* at 1314 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If the plaintiff makes this initial showing, the "burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct." *Id.* To meet this burden, a defendant must show by a preponderance of the evidence that it *would* have reached the same decision; it is insufficient to show merely that it *could* have reached the same decision. *Id.* at 1315.[7]

---

[7]The State employees would also have us impose a requirement on CarePartners to plead and prove an "absence of probable cause" with respect to their enforcement decisions, relying on *Hartman v. Moore*, 547 U.S. 250 (2006). We decline to do so. In *Hartman*, the Court held that a plaintiff in a retaliatory-prosecution action must plead and show the absence of probable cause for pressing the underlying criminal charges, and based its holding on the unique need to "bridge" a causation gap between the non-prosecuting government agent's retaliatory animus and

Because our decision in *Soranno's Gasco* directs our analysis here, we review the facts of that case in some detail. The plaintiffs in *Soranno's Gasco* were sellers and distributors of petroleum products that operated under certain bulk plant permits. Soranno, as owner of Sorrano's Gasco ("Gasco"), publicly challenged certain new regulations promulgated by the county and the air pollution district, speaking out at County Board of Supervisors meetings and initiating litigation to challenge the regulations. Subsequently, the air pollution district demanded certain documentation from Soranno, which Sorrano refused to provide on the grounds that the demand was an improper attempt at discovery related to a civil penalty action the county had filed against Gasco. The air pollution district then exercised its statutory authority and suspended Gasco's bulk plant permits, and a pollution control officer circulated a letter to Gasco's clients informing them of Gasco's permit suspension and of possible adverse impact on their own businesses.

Sorrano and Gasco brought an action under 42 U.S.C. § 1983 against the county, the air pollution district, and several officials on the grounds that the defendants suspended Gasco's petroleum bulk plant permits and discouraged its customers from doing business with Gasco in retaliation for Soranno's exercise of constitutionally protected speech and petition rights. We vacated the grant of summary judgment and held that: (1) the plaintiffs had protected rights in com-

the prosecutor's independent decision, which is accorded presumptive regularity. *Id.* at 252, 263-66. *Hartman* does not apply to this case because the Court made a clear distinction between retaliatory-prosecution actions to which the additional pleading and proof requirements apply, and "ordinary" retaliation actions to which the requirements do not apply (i.e., where there is no independent prosecutorial action). *Id.* at 259-62; *accord Skoog*, 469 F.3d at 1233-34 (recognizing that *Hartman's* absence of probable cause element applies to "a particular subcategory of retaliation claims: retaliatory prosecution claims"). This case involves an ordinary retaliation action and, therefore, *Hartman* is inapplicable.

menting on the conduct of government officials and in petitioning the government for redress of grievances, and (2) Soranno's protected expression was a substantial factor in the decision to suspend Gasco's permits. *Id.* at 1314-15. We based our finding that Sorrano's protected expression was a substantial factor in the air pollution district's decision on the timing of the district's suspension action and a phone call in which the pollution control officer intimated to Sorrano that he would "somehow get even" with Soranno for generating embarrassing publicity about the challenged regulations. *Id.* at 1315-16.

**[3]** The present case closely resembles *Soranno's Gasco*. As discussed above, Kilkelly engaged in protected First Amendment activity by way of his petition for administrative review of agency decisions, lobbying efforts, advocacy related to interpretation of the building codes, and public statements criticizing the State employees. Assuming that CarePartners's version of the material facts is correct, as we must in the context of an interlocutory appeal of a qualified immunity decision, CarePartners has met its initial burden of showing that its speech was a substantial or motivating factor behind the State employees' decision to take the actions described above. First, the timing of the State employees' investigation of CarePartners and the summary suspension and revocation of its license were suspiciously close in time to the administrative hearing on the Meridian facility and Kilkelly's lobbying efforts regarding the Lakewood facility. *See Soranno's Gasco*, 874 F.2d at 1316 (recognizing that the suspicious timing and nature of the permit suspension contributed to the finding that Soranno's protected expression was a substantial factor in the suspension decision). Second, the existence of a retaliatory intent is supported by Dale's declaration indicating that DSHS officials were "quickly losing patience" with Kilkelly, and that the Assistant Attorney General told Dale that Kilkelly was "known to the department." Third, the record, based on limited discovery conducted thus far, contains e-mails that suggest DSHS was planning to take

action against Alderwood and Wenatchee before it conducted its follow-up inspections. Finally, the record indicates that DSHS may have been deliberately refusing to communicate with Kilkelly despite his expressed willingness to install a sprinkler system. In the context of an interlocutory appeal on qualified immunity, these facts indicate that CarePartners has demonstrated that Kilkelly's protected expression may well have been a substantial factor in the State employees' aggressive enforcement decisions.

The district court properly declined to determine whether the State *would* have made the decisions it did in the absence of Kilkelly's protected speech and petition activity because issues of fact remained with regard to the State employees' motivations. *Id.* at 1316 ("[T]he potential section 1983 liability depends upon the defendants' motivation. This is a genuine issue of material fact and is therefore inappropriate for summary judgment.") (citation omitted). The district court provided, however, that once the parties conducted additional discovery they could file new motions for summary judgment. We may not make factual findings regarding the State employees' motivations, and thus leave this question for further proceedings in the district court.[8]

---

[8]This conclusion is not altered by the State employees' thinly supported request that we accord some type of preclusive effect to an order of the Superior Court of Washington dismissing CarePartners's administrative appeal with prejudice. They argue that the dismissal of that appeal demonstrates that the validity of the licensing actions is a "verity," and thus the enforcement action *would* have occurred despite any retaliatory motive. The argument is not persuasive. First, the administrative appeal was not decided on the merits and the claim was not actually litigated, as the court dismissed the appeal with prejudice because CarePartners withdrew its appeal. *See Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 880 & n.5 (9th Cir. 2007). Second, the district court refused to consider the State employees' "res judicata" argument because it was first raised in a reply brief and CarePartners was unable to respond to the argument. We will not ordinarily consider an issue raised for the first time on appeal, and decline to do so here. *See Int'l Union of Bricklayers & Allied Craftsmen Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985).

### 2. *Importation of the public concern requirement and the* Pickering *Balancing Test*

The State employees assert that two criteria applicable to the evaluation of a public employee's speech-based retaliation claims should apply generally to First Amendment retaliation claims by regulated entities: first, that the speech at issue address a matter of public concern; and, second, that even if that speech addresses a matter of public concern it survive what is known as the *Pickering* balancing test. They rely primarily on *Tennessee Secondary School Athletic Association v. Brentwood Academy*, 127 S. Ct. 2489 (2007), which they argue held that the public concern requirement and *Pickering* balancing test apply generally to the regulated entity context. In *Brentwood Academy*, the Court held that a state-sponsored high school athletic league could impose conditions on its member schools' coaches' speech—aimed at "hard-sell recruiting" of middle school children to high school teams— that were necessary to managing an efficient and effective league. *Id.* at 2495. As discussed below, however, *Brentwood Academy* is distinguishable. Moreover, the rationales underlying the "public concern" requirement and the *Pickering* balancing test in the public employee context do not support the extension of this analytical framework to the regulated entity context.

**[4]** In the specific context of speech-based retaliation claims made by public employees, the Supreme Court has held that the "First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern." *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (citing *Connick v. Meyers*, 461 U.S. 138, 146 (1983)); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Analysis of a government employee's speech-based retaliation claim is similar to speech-based retaliation claims by regulated entities— the employee must initially show that the conduct at issue was protected and that it was a substantial or motivating factor for

the adverse action, with the burden then shifting to the government to demonstrate that it would have taken the same action in the absence of the protected conduct—but adds two additional criteria. *See Umbehr*, 518 U.S. at 675 (citing *Mt. Healthy*, 429 U.S. at 287); *Garcetti*, 547 U.S. at 418. First, the public employee's speech at issue must be on a matter of public concern, i.e., speech made as a private citizen "fairly considered as relating to any matter of political, social, or other concern to the community," as opposed to speech by an employee about matters of personal interest. *See Connick*, 461 U.S. at 146-48; *see also Umbehr*, 518 U.S. at 675-76. Second, even an adverse action based on protected speech "may be justified when legitimate countervailing government interests are sufficiently strong." *Umbehr*, 518 U.S. at 675.

**[5]** This latter aspect, the "*Pickering* balancing test," recognizes that First Amendment rights of a government employee in retaliation claims depend on the " 'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Umbehr*, 518 U.S. at 676 (alteration in original) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)); *see also Garcetti*, 547 U.S. at 418 ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.").[9]

**[6]** The additional criteria for a government employee's retaliation claim based on First Amendment activity do not categorically apply to a claim by a regulated entity. The history, rationale, and limited nature of the public concern requirement and *Pickering* balancing test, as well as existing

---

[9]In *Umbehr*, the Supreme Court extended this analytical framework to cover independent government contractors. 518 U.S. at 677, 685; *accord Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004).

circuit precedent, do not support their application in the regulated entity context. In *Connick*, the Supreme Court discussed the public concern requirement with specific and limited reference to the field of public employee speech and explained that it was based on the need to balance government employees' speech rights with the government's needs as an employer. 461 U.S. at 142-44; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir. 1999) (en banc) (per curiam) (noting, in discussing the origins of the public concern test, that "[t]he story of the public concern limitation is a story about the free speech of public employees").[10]

[7] Moreover, we have already prescribed the framework for analyzing speech and petition-based retaliation claims by regulated entities, and that framework does not include the question of whether the speech was on a matter of public concern or use of the *Pickering* balancing test. *See Soranno's Gasco*, 874 F.2d at 1314-15.[11] Although the *Soranno's Gasco* court did not specifically address the public concern requirement or the *Pickering* balancing test, it surely was apprised, in 1989, of the approach that the Supreme Court had adopted in its public employee speech retaliation cases. *See*, *e.g.*, *Connick*, 461 U.S. 138 (decided in 1983); *Pickering*, 391 U.S. 563 (decided in 1968).

---

[10]We note that the public concern requirement and the *Pickering* balancing test have their genesis in the Supreme Court's attempts to *expand*, not reduce, the public employees' speech rights. *See Connick*, 461 U.S. at 143-46. These criteria represent the culmination of years of decisions that whittled away the "unchallenged dogma . . . that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Id.* at 143. The Court's intent was to safeguard public employees' rights to speak on matters of public concern.

[11]Similarly, in *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 151-52 (2d Cir. 2006), the Second Circuit discussed the standards to be used to evaluate a nursing home's claim that state and federal regulators retaliated against it because of its complaints, protests, and lawsuits regarding regulations, but did not mention the public concern requirement or the *Pickering* balancing test.

The rationales for the public concern requirement as well as the *Pickering* balancing test weigh against their application to retaliation claims by regulated entities. In discussing the public concern test, the Third Circuit stated:

> The "public concern" test was formulated by the Supreme Court in addressing speech restrictions placed by governmental entities on their own public employees. Regulation of public employee speech presented two features not present in other forms of speech control. First, acting as an employer, the government has some authority to impose conditions upon those who seek jobs, including conditions that limit the exercise of otherwise available constitutional rights. Second, "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her."

*Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 283 (3d Cir. 2004) (citations omitted).

**[8]** The Fifth Circuit has similarly noted that, "[i]n general, courts have invoked two reasons for applying the [public concern requirement and the *Pickering* balancing] test outside of the employment context: [first,] that the relationship involved was analogous to an employer-employee relationship[; and, second,] that the principle underlying *Connick* warranted its application," i.e., the need to balance between the interests of the employee, as citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *See Blackburn v. City of Marshall*, 42 F.3d 925, 932-34 (5th Cir. 1995) (collecting cases where public concern requirement was extended to cover relationships analogous to government employer-employee relationship).

Here, the relationship between CarePartners, a licensee, and the State of Washington does not resemble an employment relationship, and CarePartners's grievances do not resemble ordinary workplace grievances.[12]

[9] Other circuits have also cautioned against extending the criteria beyond the public employment context, noting the origins and limited nature of the public concern requirement and the *Pickering* balancing test. *See Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586-87 (6th Cir. 2008) (alleged retaliation by school board against student for mother's speech); *Van Deelen v. Johnson*, 497 F.3d 1151, 1156-57 (10th Cir. 2007) (declining to apply criteria to alleged retaliation against taxpayer for bringing tax assessment challenges); *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 154-55 (1st Cir. 2003) (declining to apply criteria to alleged retaliation against state employee, who also was a private certified septic system inspector, for filing previous lawsuit against county); *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000) (declining to apply criteria to alleged retaliation against prisoner for having sought public assistance benefits); *Vickery v. Jones*, 100 F.3d 1334, 1346 n.1 (7th Cir. 1996) (declining to apply criteria to alleged retaliation by Illinois State officials and Illinois Republican Party against applicant for appointment to a "temporary highway maintainer" position because of political affiliation). We find our colleagues' reasoning persuasive and accordingly do not apply the public concern requirement and *Pickering* balancing test to CarePartners's retaliation claim.

[10] Finally, we distinguish *Brentwood Academy*, 127 S. Ct. 2489, upon which the State employees rely for their

---

[12]In contrast, in *Havekost v. U.S. Department of the Navy*, 925 F.2d 316, 317-18 (9th Cir. 1991), we noted that the *Connick/Pickering* standards were not directly on point, but applied public employee standards to the retaliation claim of a grocery bagger licensed to work in a military facility where the speech at issue was "nothing more than a workplace grievance."

requested extension of the law governing First Amendment retaliation claims by public employees. *Brentwood Academy* involved the regulation of speech rights that the high schools at issue contracted away in exchange for participation in a private athletic league deemed by the Court to be a state actor. Where an entity specifically contracts with a government entity for a benefit which directly flows from some limitation of speech, a challenge to the contracted-for limitation raises concerns similar to the public employee context: whether the speech is on a matter of public concern, and whether the government has an employer-like interest in the controversy. Those concerns are not present here. Nothing in *Brentwood Academy* suggests that these additional criteria should be applied to all entities that are to a greater or lesser extent regulated by a government. Rather, consistent with our colleagues from other circuits and with the shifting of burdens that occurs once a showing of protected activity has been made, we hold that the State employees have failed to show that their relationship with CarePartners is sufficiently analogous to the public employee context to allow the imposition of the additional criteria. We conclude that *Brentwood Academy* does not compel this court to extend the public employee retaliation analysis beyond its current moorings in this circuit.

## B.   Clearly established rights

**[11]** Having established a constitutional violation based on the facts alleged by CarePartners, we next turn to the question of whether the First Amendment rights violated were "clearly established" at the time of the alleged violations, i.e., "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citation and internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. However, the injured party "need not establish that the Defendants' 'behavior had been previously declared unconstitutional.' " *Hydrick v.*

*Hunter*, 500 F.3d 978, 989 (9th Cir. 2007) (quoting *Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir. 1997)). The dispositive inquiry is "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

**[12]** As the district court properly concluded, the relevant law was clearly established at the time of the alleged violation. In *Soranno's Gasco*, decided in 1989, we held that it is unlawful for the government to deliberately retaliate against a citizen for exercising his right to comment on (and publicly criticize) government officials' actions and his right to access the courts and administrative appeals process for redress of grievances. 874 F.2d at 1314-15 (citing *Mt. Healthy*, 429 U.S. 274). As discussed above, the facts in *Soranno's Gasco* closely resemble the facts in the present appeal—both cases involve a regulated entity claiming intentional retaliation by government officials because of the exercise of speech and petition rights. Notably, in discussing a qualified immunity defense, we stated that "[i]t could hardly be disputed that at the time of the permit suspension an individual had a clearly established right to be free of intentional retaliation by government officials based upon that individual's constitutionally protected expression." *Id.* at 1319. Accordingly, based on the allegations of CarePartners before the court on summary judgment, we conclude that it would have been "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Therefore, the First Amendment rights advanced by CarePartners were clearly established for the purpose of evaluating the State employees' qualified immunity defense.

The State employees argue, however, that the question of whether to apply a "matter of public concern" requirement from the public employee context to regulated entities' speech is unsettled and thus the law is not clearly established. They contend that *Soranno's Gasco* does not resolve the issue because the parties in that case did not raise the "public con-

cern" argument that the State employees have raised here, and, therefore, the court made no determination on that more particularized question.

**[13]** However, the assertion of an unsuccessful defense to a violation of a constitutional right does not render the right "unsettled" or not "clearly established." Notwithstanding the fact that the *Soranno's Gasco* court did not make a specific holding regarding the application of the "public concern" requirement and *Pickering* balancing test beyond the public employee context, that panel addressed a regulated entity's precise claim of retaliation by government officials as a result of the entity's owners' public comments and petition to the courts to challenge a regulatory act. The scope of the rights at issue here were particularized enough at the time of the violation to satisfy the *Saucier* test for "clearly established" law.

The State employees also argue that this court should not rely on *Soranno's Gasco* because that decision relied in part on a causation test from the public employee context, *Mt. Healthy*, 429 U.S. 274. Far from being persuasive, this tends to bolster the argument that the public concern should not be grafted onto the regulated entity context because the *Soranno's Gasco* court knew of the causation test and yet decided not to apply it to the regulated entity's retaliation claim.

Finally, we reject any suggestion that the State employees could have believed, "reasonably but mistakenly," that their conduct did not violate a clearly established constitutional right. *Inouye*, 504 F.3d at 712 & n.6; *Skoog*, 469 F.3d at 1229. The speech and petition rights at issue have been clearly established in this circuit since 1989. At least at the summary judgment stage, absent some type of extraordinary showing that is not present here, a court could hardly find that the government officials "reasonably but mistakenly" believed that they could retaliate against a regulated entity and its owners for exercising their First Amendment rights.

**IV. Conclusion**

The district court correctly concluded that a grant of qualified immunity would be premature because CarePartners could potentially establish a prima facie case of retaliation given the opportunity to conduct full discovery. Taking CarePartners's allegations as true, it established that Kilkelly engaged in protected speech and petition activities, and that such activities may have been a substantial or motivating factor for the State employees' disparate enforcement action. Moreover, the State employees failed to show that the constitutional rights at issue were not clearly established. Finally, we hold that the public concern requirement and *Pickering* balancing test do not apply to First Amendment retaliation claims in the regulated entity context. Accordingly, the district court's denial of summary judgment on qualified immunity is **AFFIRMED**.