**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEN BLAIR,

          *Plaintiff-Appellant,*

    v.

BETHEL SCHOOL DISTRICT, a
municipal corporation; TOM
SEIGEL, superintendent of Bethel
School District and in his
individual capacity and his marital
community; JANE DOE SEIGEL;
BRENDA ROGERS, president of the
Bethel School District school
board and in her individual
capacity and her marital
community; JOHN DOE ROGERS;
SUSAN SMITH, vice president of the
Bethel School District school
board in her individual capacity
and her marital community; JOHN
DOE SMITH; JOHN MANNING, board
member of the Bethel School
District school board in his
individual capacity and his marital
community; JANE DOE MANNING,

          *Defendants-Appellees.*

No. 08-35895

D.C. No.
CV-08-5181-FDB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
October 16, 2009—Seattle, Washington

8725

Filed June 14, 2010

Before: Johnnie B. Rawlinson and Consuelo M. Callahan, Circuit Judges, and Larry A. Burns,* District Judge.

Opinion by Judge Burns

---

*The Honorable Larry Alan Burns, District Judge for the Southern District of California, sitting by designation.

## COUNSEL

Paul A. Lindenmuth, Law Offices of Ben F. Barcus & Associates, PLLC, Tacoma, Washington, for the plaintiff-appellant.

William A. Coats and Daniel C. Montopoli, Vandeberg Johnson & Gandara, Tacoma, Washington, for the defendants-appellees.

## OPINION

BURNS, District Judge:

Ken Blair maintains his First Amendment rights were violated when his fellow school board members voted to remove him as their vice president because of his relentless criticism of the school district's superintendent. The district court disagreed, and so do we. To be sure, the First Amendment protects Blair's discordant speech as a general matter; it does not, however, immunize him from the political fallout of what he says.

I

## BACKGROUND

Blair has served as a publicly elected member of the Bethel School District School Board since 1999. There are four other Board members, who are also publicly elected. The members of the Board elect their own president, vice president, and legislative representative. Blair has served in each position over the years, but most recently, until October 2007, he was the Board's vice president.

Defendant-Appellee Tom Seigel was hired as superintendent of the Bethel School District in 2000. Blair has been a

persistent critic of Seigel almost from the beginning, repeatedly impugning his integrity and competence. There are many examples, but one makes the point: early in Seigel's first term, Blair apparently insinuated to the Board and to the State Auditor that Seigel was defrauding the school district by requesting reimbursement for his moving expenses when in fact Seigel had been moved by the military. Blair is apparently the only Board member who is dissatisfied with Seigel, and since 2005 he has consistently voted against renewing Seigel's contract.

On September 25, 2007, the Board voted 4-1 to extend Seigel's contract and raise his pay. Blair was the lone dissenter. The next day, he explained his dissenting vote to a newspaper reporter, who then quoted Blair in a story saying, "My biggest issue with the superintendent is trust . . . . I have too many examples to say he's doing a good job."

Blair's statements to the reporter were the last straw for his fellow Board members, and on October 9, 2007 they voted to remove him as vice president. Blair then sued the Bethel School District, Seigel, and the other Board members under 42 U.S.C. § 1983, alleging that he was retaliated against for exercising his First Amendment rights to free speech and petition. The district court granted summary judgment for the defendants, finding the Board's action didn't prevent Blair from continuing to speak out, vote his conscience, and serve his constituents as a member of the Board. We agree with this finding, and with the district court's more general conclusion that the First Amendment doesn't shield public figures from the give-and-take of the political process.

II

DISCUSSION

**[1]** The First Amendment forbids government officials from retaliating against individuals for speaking out. *Hartman*

*v. Moore*, 547 U.S. 250, 256 (2006); *see also Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity;[1] and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *See Pinard v. Clatskanie School Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). Here, it is uncontested that Blair's votes as a Board member and his statements to the newspaper were protected by the First Amendment, and that Blair's advocacy against Seigel was the cause for the Board's decision to remove him from the vice president position. It is also uncontested that the members of the Board are "state actors."[2] Were this a typical First Amendment retaliation case, we would be left to evalu-

---

[1]The district court held that "in order for governmental action to trigger First Amendment scrutiny, it must carry consequences that infringe upon protected speech." *Blair v. Bethel Sch. Dist.*, No. C08-5181, 2008 WL 4740159 at *3 (W.D. Wash. Oct. 24, 2008) (citation omitted). Just to be clear, we do not require *actual* infringement in retaliation cases. Rather, "[i]n a First Amendment retaliation case, an adverse . . . action is an act that is *reasonably likely* to deter employees from engaging in constitutionally protected speech." *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003) (emphasis added). Put differently, the question is whether the alleged retaliation would "chill or silence a person of ordinary firmness" from continuing to speak out. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

[2]To be liable under § 1983, a government official must be "acting, purporting, or pretending to act in the performance of his or her official duties." *McDade v. West*, 223 F.3d 1135, 1140 (9th Cir. 2000). Although it is not obvious to us that the election (or demotion) of board officers is an official duty of the Board members — in the same category, for example, as overseeing the hiring of teachers and making curriculum decisions — we assume the Board members were state actors because the issue is undisputed here. *See Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006) (whether an officer acts under state law turns on the nature and circumstances of his conduct).

ate only whether the Board's action would chill a person of ordinary firmness from continuing to speak out.

But Blair's case is not a typical First Amendment retaliation case. What's different here is the "adverse action" Blair is challenging was taken by his peers in the political arena. The record makes clear that Blair's fellow Board members wanted a vice president who shared their views. Because Blair didn't, they removed him by a procedurally legitimate vote. The peculiar context in which Blair's case arises distinguishes it from the ordinary retaliation case in three crucial ways.

**[2]** First, the adverse action Blair complains of was a rather minor indignity, and de minimis deprivations of benefits and privileges on account of one's speech do not give rise to a First Amendment claim. Rather, for adverse, retaliatory actions to offend the First Amendment, they must be of a nature that would stifle someone from speaking out. The most familiar adverse actions are "exercise[s] of governmental power" that are "regulatory, proscriptive, or compulsory in nature" and have the effect of punishing someone for his or her speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

The prototypical plaintiff in these cases is a government worker who loses his job as a result of some public communication critical of the government entity for whom he works, *e.g.*, *Pickering v. Bd. of Educ. of Township High Sch. Dist.*, 391 U.S. 563, 564 (1968) (teacher dismissed by the Board of Education after sending a letter critical of the Board to a local newspaper), or a regulated entity that is stripped of its business license after engaging in speech that displeases the regulator, *e.g.*, *CarePartners, LLC v. Lashway*, 545 F.3d 867, 871 (9th Cir. 2008) (boarding home operators engaged in lobbying and other speech and petition activities which they alleged led to retaliation by the regulators), or a prisoner who is retaliated against by prison officials for filing grievances or initiating actions in court, *e.g.*, *Bruce v. Ylst*, 351 F.3d 1283, 1286 (9th Cir. 2003) (prison officials allegedly retaliated against pris-

oner on the basis of his jailhouse lawyering activities), or citizens who are allegedly targeted by law enforcement because of their political speech activities, *e.g.*, *Mendocino Envtl. Ctr.*, 192 F.3d at 1288-89 (police officers sued for engaging in conspiracy to falsely accuse political activists of a crime in an effort to inhibit their political activities).

**[3]** Blair has little in common with these prototypical plaintiffs. Through the ordinary functioning of the democratic process, he was removed from a titular position on a school board by the very people who elected him to the position in the first place. The Board's objective in stripping Blair of his leadership position, ostensibly, wasn't to punish him for his advocacy but instead to put in place a vice president who better represented the majority view. But even if the Board's intent was to play political hardball in response to Blair's advocacy, his authority as a member of the Board was unaffected; despite his removal as Board vice president, he retained the full range of rights and prerogatives that came with having been publicly elected. The district court found Blair's removal from the Board leadership position didn't chill his speech, and the record supports that finding.

**[4]** Second, as the district court intuited, more is fair in electoral politics than in other contexts. It is common for political bodies to have internal leadership structures and for members of those bodies to be openly partisan in voting for and against one another for leadership positions. In fact, we *expect* political officials to cast votes in internal elections in a manner that is, technically speaking, retaliatory, *i.e.*, to vote against candidates whose views differ from their own. Indeed, an internal political leadership election is often a referendum on the majority point of view. Yet, to accept Blair's argument is to hold that the First Amendment prohibits elected officials from voting against candidates whose speech or views they don't embrace.[3] Experience and political reality convince us

---

[3]Blair argues his speech deserves enhanced protection because it was *political* speech that exposed corruption, mismanagement and waste

this argument goes too far; the First Amendment does not succor casualties of the regular functioning of the political process.[4]

To lend perspective to this point, we conceive little difference between what the Board's internal vote against Blair accomplished and what voters in a general public election might do if they too were disaffected by Blair's advocacy. In other words, it wouldn't have been controversial in the least — and certainly not a violation of the First Amendment — had Blair's constituents refused to support his reelection on account of his outspoken opposition to Superintendent Seigel. We see no reason the Board members' votes here should be regulated in a way that the general public's are not.

Third, it is significant that Blair isn't the only party in this case whose interests implicate First Amendment concerns. To the contrary, we assume *all* of the Board members have a pro-

within the Bethel School District. It is true that "[p]olitical speech lies at the core of the First Amendment's protections." *Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1079 (9th Cir. 1990). However, we have limited the heightened protection of speech on matters of public concern to private citizens and government employees speaking as private citizens. *See*, *e.g.*, *Posey v. Lake Pend Oreille Dist. No. 84*, 546 F.3d 1121, 1123 (9th Cir. 2008) (involving a high school "security specialist" who voiced concerns about a school district's safety and emergency policies). No equivalent protection has been extended to government officials engaged in the give-and-take of politics.

[4]To be very clear, we do not suggest that the retaliatory acts of elected officials against their own can never violate the Constitution. Obviously, they can. *See Bond v. Floyd*, 385 U.S. 116 (1966). In *Bond*, the plaintiff had been popularly elected to the Georgia House of Representatives, but was blocked from taking office by a vote of his peers on the trumped-up ground he could not, in good faith, take the requisite oath of office to support the Constitution. *Id.* at 118. The refusal to seat Bond was retaliatory and had the effect, deleterious to democracy, of nullifying a popular vote. *Id.* at 136-37. This would be a different case had Blair's peers somehow managed to vote him off the Board or deprive him of authority he enjoyed by virtue of his popular election — but they didn't. Bond and Blair have little more in common than the enmity of their peers.

tected interest in speaking out and voting their conscience on the important issues they confront — issues like teachers' pay, curriculum policy, and allocation of education resources. The First Circuit has recognized this point explicitly: "Voting by members of municipal boards, commissions, and authorities comes within the heartland of First Amendment doctrine, and the status of public officials' votes as constitutionally protected speech [is] established beyond peradventure of doubt . . . ." *Stella v. Kelly*, 63 F.3d 71, 75 (1st Cir. 1995). Blair offers no rationale for why this assumption does not apply to the Board's vote on the seemingly less important *internal* matter of who among them is best to fill certain titular, leadership positions.

Here, the vote to remove Blair as Board vice president communicated to Blair and to the public that the Board majority viewed Seigel's performance very differently from the way Blair saw it, and wanted to distance itself from Blair's criticism of the superintendent. The point isn't that the vote against Blair was protected speech simply because it was expressive. Almost all retaliatory actions can be said to be expressive, including those that are manifestly unconstitutional. But, while Blair certainly had a First Amendment right to criticize Seigel and vote against his retention as superintendent, his fellow Board members had the corresponding right to replace Blair with someone who, in their view, represented the majority view of the Board.

[5] While this is the first time our circuit has considered a First Amendment retaliation claim that arises in the context of the political process and public debate, both the Sixth Circuit and the Tenth Circuit have evaluated similar claims. In *Zilich v. Longo*, 34 F.3d 359, 361 (6th Cir. 1994), the defendants were city council members who passed a resolution stating that an outgoing council member who had been a thorn in their side had never been qualified to hold office. The outgoing member sued on the ground the resolution was retaliation for his political opposition to the mayor. *Id.* at 363. The Sixth

Circuit rejected the claim, recognizing that "[v]oting on legislative resolutions expressing political viewpoints may itself be protected speech," and concluding, "[a] legislative body does not violate the First Amendment when some members cast their votes in opposition to other members out of political spite or for partisan, political, or ideological reasons." *Id.*

**[6]** Similarly, in *Phelan v. Laramie County Cmty. Coll. Bd.*, 235 F.3d 1243, 1245-46 (10th Cir. 2000), a community college board censured one of its trustees for violating an ethics policy by placing a newspaper ad encouraging the public to vote against a pending measure. The censured trustee sued, but the Tenth Circuit held that "[i]n censuring Ms. Phelan, Board members sought only to voice their opinion that she violated the ethics policy and to ask that she not engage in similar conduct in the future." *Id.* at 1248.

**[7]** We agree with the analysis of the Sixth Circuit in *Zilich* and the Tenth Circuit in *Phelan*. Blair's removal from the titular position of Board vice president is, for First Amendment purposes, analogous to the condemning resolution in *Zilich* and the censure in *Phelan*, and those decisions support our conclusion here. Disagreement is endemic to politics, and naturally plays out in how votes are cast. While the impetus to remove Blair as Bethel School Board vice president undoubtedly stemmed from his contrarian advocacy against Siegel, the Board's action did not amount to retaliation in violation of the First Amendment.

## III

## CONCLUSION

The decision of the district court is AFFIRMED.