**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRIAN J. BOQUIST,
  *Plaintiff-Appellant*,

v.

PETER COURTNEY, Oregon State
Senate President, in his official
capacity; FLOYD PROZANSKI,
Senator, in his official capacity as
Chairman of the Senate Special
Committee on Conduct; JAMES
MANNING, Senator, in his official
capacity as member of the Special
Senate Conduct Committee;
DEXTER JOHNSON, in his official
capacity as Legislative Counsel;
JESSICA KNIELING, in her official
capacity as interim Human
Resources Director; BRENDA KAY
BAUMGART, in her official
capacity as contract investigators
to the Oregon State Senate;
DARON HILL, in his official
Legislative Administration
capacity; MELISSA J. HEALY, in
her official capacity as contract
investigators to the Oregon State
Senate, and all in their official

No. 20-35080

D.C. No.
6:19-cv-01163-MC

OPINION

capacities in the Legislative
Branch of the State of Oregon,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Submitted October 6, 2021[*]
Portland, Oregon

Filed April 21, 2022

Before: William A. Fletcher, Sandra S. Ikuta, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Ikuta

---

[*] We previously granted appellant's motion to submit this case on the
briefs without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's dismissal of a First Amendment retaliation claim in an action brought by Oregon minority party state senator Brian Boquist who alleged that majority party members retaliated against him for engaging in protected speech when, in response to two statements made by Boquist, defendants ordered him not to enter the state capitol without giving them 12 hours advance notice.

After minority party state senators in Oregon walked out of the state senate to prevent a quorum, members of the majority party threatened to send the state police to arrest them and return them to the capitol. Boquist made two statements stating he would resist any such attempt to arrest him. The first, made on the floor of the senate, stated in part: "Mr. President, and if you send that state police to get me, Hell's coming to visit you personally." The second, made to a reporter in the state capitol building, stated in part: "This is what I told the [state police] superintendent: Send bachelors and come heavily armed. I'm not going to be a political prisoner in the state of Oregon. It's just that simple."

The panel stated that an elected official raising a First Amendment retaliation claim has the initial burden of pleading and proving that: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. Upon such a showing, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of. The panel additionally explained that the framework that applies to evaluating speech restrictions that the government imposes on its employees is not applicable to evaluating restrictions on the speech of elected officials. Nor does the balancing test set forth in *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 564 (1968), apply to an elected official's claim of First Amendment retaliation by the official's elected peers.

Applying the foregoing framework, the panel held that there was no doubt that Boquist's complaint raised a plausible inference that he was engaging in protected speech. In considering defendants' argument that Boquist's statements were not protected because they constituted unprotected fighting words, the panel held, that at the motion to dismiss stage, it could not say that Boquist's statements created a likelihood that the person addressed would make an immediate violent response. Even a statement that appears to threaten violence may not be a true threat if the context indicates that it only expressed political opposition or was emotionally charged rhetoric.

Boquist satisfied the second prong of the prima facie test because his complaint plausibly alleged that the 12-hour notice rule was a materially adverse action. Finally, Boquist's complaint plausibly alleged that his speech played a part, substantial or otherwise, in the retaliation. On remand, defendants were free to raise the affirmative defense that, in

instituting the 12-hour notice rule, they were motivated by vital information conveyed by Boquist's speech that raised an objectively legitimate need to implement security measures and that justified the particular measures they chose. But defendants' affirmative defense was not apparent as a matter of law from the face of the complaint and was therefore not grounds for dismissal at the pleading stage.

## COUNSEL

Brian J. Boquist, Dallas, Oregon, pro se Plaintiff-Appellant.

Jona J. Maukonen, Assistant Attorney-In-Charge; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Department of Justice, Salem, Oregon; for Defendants-Appellees.

## OPINION

IKUTA, Circuit Judge:

After minority party state senators in Oregon walked out of the state senate to prevent a quorum, members of the majority party threatened to send the state police to arrest them and return them to the capitol. One minority party senator, Brian J. Boquist, made two statements (one on the floor of the senate, and the other to a reporter in the state capitol building) stating he would resist any such attempt to arrest him. In response, majority party members ordered him not to enter the state capitol without giving them 12 hours advance notice. Boquist brought this action against three defendants (state senators Peter Courtney, Floyd Prozanski,

and James Manning), on the ground that the order impermissibly retaliated against him for engaging in speech protected by the First Amendment.

We conclude that the district court erred in dismissing Boquist's First Amendment retaliation claim for failure to state a claim because Boquist adequately alleged that he engaged in constitutionally protected speech and was subject to a retaliatory adverse action on account of that speech. The senate majority members, however, will have an opportunity to raise affirmative defenses, including that their actions were motivated by legitimate security concerns.[1]

I

We recite the facts alleged in Boquist's first amended complaint, which we assume to be true at the pleading stage. *See Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). We also rely on the facts in various documents that are attached to, and referenced in, Boquist's complaint.[2] *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (holding that a court may consider "certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment").

---

[1] In a memorandum disposition filed concurrently with this opinion, ___ Fed. App'x ___, we affirm the district court's dismissal of Boquist's remaining claims.

[2] The complaint attaches internal State Senate memoranda, news articles, and a transcript of a hearing before the Senate Special Committee on Conduct.

On May 7, 2019, twelve minority party members of the Oregon State Senate, including Boquist, walked out of the Senate chamber to prevent the Senate from having a quorum. The walk-out was a protest against Senate President Peter Courtney and Senate Majority Leader Ginny Burdick, among others, for their role in approving a sexual harassment settlement and denying public records requests. The twelve senators who walked out remained absent until May 12, 2019. During that time period, Courtney and other majority senators stated that the senators who walked out to prevent the Senate from having a quorum could be fined, arrested, physically detained, and imprisoned.

On June 19, 2019, the Senate held debate on legislation that would limit the use of electronic signature gathering for ballot initiatives and referendums. Boquist spoke on the floor of the Senate to oppose that legislation. During his speech, Boquist said to Courtney: "I understand the threats from members of the majority that you want to arrest me, you want to put me in jail with the state police, and all that sort of stuff. . . . Mr. President, and if you send the state police to get me, Hell's coming to visit you personally." After Courtney reminded Boquist of "decorum," Boquist stated "I apologize. To you personally." Later that afternoon, Boquist talked with reporters. After explaining that his comments on the floor were in response to the Governor's threats to use the Oregon State Police to arrest senators who walked out, Boquist told the reporter, "[w]ell, I'm quotable, so here's the quote. This is what I told the [state police] superintendent:  Send bachelors and come heavily armed.  I'm not going to be a political prisoner in the state of Oregon. It's just that simple."

The next day, on June 20, 2019, a group of state minority party senators, including Boquist, again walked out of the

State Capitol to prevent the Senate from having a quorum. The same day, Burdick asked Courtney to impose a fine of $500 per day on the senators who walked out, and Courtney asked the governor of Oregon to direct the Oregon State Police to arrest absent senators. The governor approved Courtney's request on June 20, 2019. However, no senators were ever arrested and, after an agreement was reached between Courtney and Senate Minority Leader Herman Baertschiger, the minority senators returned to the Capitol on June 29, 2019.

The senate majority leadership then decided to address Boquist's statements. On the last day of the legislative session, June 30, 2019, Senator Floyd Prozanski, the chair of the Senate Special Committee on Conduct, paid a call on Boquist in his office at the State Capitol. There, Prozanski told Boquist that the Special Committee on Conduct would meet on July 8th to consider a workplace harassment complaint against Boquist and "to potentially censure and bar" Boquist from the State Capitol. The Special Committee subsequently held a hearing to determine whether Boquist's two statements (the statement to Courtney on the floor of the senate, and the subsequent statement to the reporter) "constitute a credible threat of violence." According to Prozanski's remarks at the hearing, the Special Committee would determine whether "the Senate should impose restrictions or conditions on Senator Boquist" based on "fear or threatened violence in the workplace." After deliberations, the Special Committee sent a letter to Boquist directing him to give at least twelve hours advance notice in writing to the Secretary of the Senate before he intended to visit the State Capitol (referred to herein as "the 12-hour notice rule"). The letter stated that upon such notice, the Oregon State Police would increase its presence in the State Capitol. Courtney's

office informed the media that the 12-hour notice rule would "take effect immediately."

After the Special Committee issued the 12-hour notice rule, Boquist filed a pro se complaint in district court against Courtney, Prozanski, and state senator James Manning, among others, in their official capacities. The complaint alleges that the defendants issued the 12-hour notice rule in retaliation for Boquist's speech on the floor of the Senate and in the State Capitol on June 19, 2019, in "direct violation of the free speech clause of the First Amendment." Boquist seeks a declaratory judgment that the 12-hour notice rule violates his constitutional rights. He does not seek damages. So far as the record reveals, the twelve-hour rule is still in effect against Boquist.

The district court granted the defendants' motion to dismiss the complaint for failure to state a claim. Still proceeding pro se, Boquist timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

II

We review de novo a district court's order granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678. A court must "draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Ultimately, "[d]ismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Additionally, where, as here, a plaintiff proceeds pro se, we must "construe the pleadings liberally" and "afford the petitioner the benefit of any doubt." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A liberal construction of a pro se complaint, however, does not mean that the court will supply essential elements of a claim that are absent from the complaint. *See Litmon v. Harris*, 768 F.3d 1237, 1241 (9th Cir. 2014).

"Ordinarily affirmative defenses may not be raised by motion to dismiss . . . ." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam). But a complaint may be dismissed when the allegations of the complaint give rise to an affirmative defense that clearly appears on the face of the pleading. *McCalden v. California Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990), *superseded by rule on other grounds as stated in Harmston v. City & County of San Francisco*, 627 F.3d 1273 (9th Cir. 2010). An affirmative defense is grounds for dismissal at the pleading stage only if "the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense . . . ." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018) (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

III

We begin with the framework for a First Amendment retaliation claim. The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This prohibition applies to state and local governments by way of incorporation. *Nordyke v. Santa Clara Cty.*, 110 F.3d 707, 710 (9th Cir. 1997). "[A]s a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, — S. Ct. —, No. 20-804, 2022 WL 867307, at \*3 (U.S. Mar. 24, 2022) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (internal quotation marks omitted).

Claims that government officials subjected an individual to retaliatory action are not limited to a particular context. They have been raised by government employees, government contractors, students, prisoners, business licensees, and citizens targeted by law enforcement for their political activities, among others. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 564 (1968) (government employees); *Bd. of Cnty. Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 673 (1996) (government contractors); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 759 (9th Cir. 2006) (as amended) (students); *Crawford-El v. Britton*, 523 U.S. 574, 578–79 (1998) (prisoners); *CarePartners, LLC v. Lashway*, 545 F.3d 867, 871 (9th Cir. 2008) (business licensees); *Gibson v. United States*, 781 F.2d

1334, 1337 (9th Cir. 1986) (citizens targeted by law enforcement).

## A

An elected official may likewise raise a First Amendment retaliation claim. *See Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 542–43 (9th Cir. 2010); *see also Wilson*, — S. Ct. —, 2022 WL 867307, at *5. An elected official's claim under 42 U.S.C. § 1983 for First Amendment retaliation by his elected peers begins with the elements of the plaintiff's prima facie case. As we explained in *Blair*, the elected official bringing such a legal action has the initial burden of pleading and proving: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Id.* at 543 (footnote omitted).

The first prong is readily met when elected officials express their views and opinions. In *Blair*, the plaintiff was a publicly elected member of a local school board, who was serving as the board's vice president. *Id.* at 542. After he criticized the school superintendent to a reporter, his fellow board members voted to remove him as vice president. *Id.* at 543. The plaintiff sued under § 1983 "alleging that he was retaliated against for exercising his First Amendment rights to free speech and petition." *Id.* Applying the three-pronged test for a plaintiff's prima facie case of retaliation, we held that the first prong was met: it was uncontested that the plaintiff's statements to the reporter were protected by the First Amendment. *See id.*; *see also Wood v. Georgia*,

370 U.S. 375, 388 (1962) (noting that a county sheriff who criticized a county judge in a letter to a local newspaper had engaged in "precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification").

The second prong of the prima facie case is satisfied if the elected official was subjected to a "materially adverse action." *Wilson*, — S. Ct. —, 2022 WL 867307, at *6. In *Wilson*, the elected Board of Trustees of a community college censured one of its members after he publicly accused the Board of violating its bylaws and ethical rules. *Id.* at *2–3. The member sued the Board, alleging that the censure constituted unlawful First Amendment retaliation. *Id.* at *3. *Wilson* held that the member lacked an actionable claim for First Amendment retaliation because he did not suffer a material adverse action. *See id.* at *4–7.

In determining whether the Board's censure constituted a materially adverse action, *Wilson* applied a two-prong test.

First, the Court reviewed "long settled and established practice" to determine whether a public censure had historically been "widely considered offensive to the First Amendment." *Id.* at *4 (citing *The Pocket Veto Case*, 279 U. S. 655, 689 (1929)). Based on its review of historical practice, the Court concluded that a "purely verbal censure" had not been deemed to offend First Amendment rights; rather, "elected bodies in this country have long exercised the power to censure their members." *Id.*

Second, the Court looked to "contemporary doctrine" for First Amendment retaliation claims to confirm the results of its historical review. *Id.* at *5. The Court noted that lower

courts have applied different tests to "distinguish material from immaterial adverse actions," including asking "whether the government's challenged conduct would 'chill a person of ordinary firmness' in the plaintiff's position from engaging in 'future First Amendment activity.'" *Id.* (quoting *Nieves*, 139 S. Ct. at 1721). But regardless of which test is used, courts considering the materiality of the defendant's adverse action in a First Amendment retaliation case must account for two key factors when the plaintiff is an elected official. *Id.* First, criticism from their colleagues alone is unlikely to be material, because "[i]n this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers." *Id.* Second, courts should consider whether the purported adverse action was "itself a form of speech" aimed at "the conduct of public office." *Id.* According to the Court, elected officials have the "right to examine public characters and measures through free communication," and a First Amendment retaliation claim "cannot be used as a weapon" against elected official defendants who exercised that right. *Id.* (citing Madison's Report on the Virginia Resolutions (Jan. 7, 1800), in 17 Papers of James Madison 345 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991)). In light of these considerations, *Wilson* held that the censure of the Board member was not a materially adverse action because the censure was, itself, "a form of speech by elected representatives [that] concerned the public conduct of another elected representative," and the censure "did not prevent [the Board member] from doing his job," nor did it "deny him any privilege of office." *Id.* at *6.

Our precedent is in accord. We have emphasized that it is more difficult for elected officials to establish that they were subjected to an adverse action that offends the First

Amendment because "more is fair in electoral politics than in other contexts," *Blair*, 608 F.3d at 544, and the First Amendment therefore "doesn't shield public figures from the give-and-take of the political process," *id.* at 543. In *Blair*, we agreed with other circuits that a city council's legislative resolution criticizing a departing council member is not a material adverse action, *id.* at 546 (citing *Zilich v. Longo*, 34 F.3d 359, 363 (6th Cir. 1994)), nor is a community college board's censure of one of its trustees "for violating an ethics policy by placing a newspaper ad encouraging the public to vote against a pending measure," *id.* (citing *Phelan v. Laramie Cty. Cmty. Coll. Bd.*, 235 F.3d 1243, 1245–46 (10th Cir. 2000)). We reasoned that "de minimis deprivations of benefits and privileges on account of one's speech do not give rise to a First Amendment claim." *Id.* at 544. Applying that reasoning to the plaintiff's claim in *Blair*, we concluded that the board members' decision to strip the plaintiff of his titular role as vice president was part of the "regular functioning of the political process." *Id.* at 545. Because the plaintiff's "authority as a member of the Board was unaffected," and "he retained the full range of rights and prerogatives that came with having been publicly elected," he did not suffer a material adverse action, and therefore failed to make a prima facie showing of First Amendment retaliation. *Id.* at 544.

Neither *Wilson* nor *Blair* held that an adverse action against an elected official could never be sufficiently material to raise an actionable claim for First Amendment retaliation. *Blair* made it "very clear" that "retaliatory acts of elected officials against their own" can violate the Constitution in some circumstances, and that the plaintiff's case would have been different had the plaintiff's peers on the school board "somehow managed to vote him off the Board or deprive him of authority he enjoyed by virtue of his popular election." *Id.*

at 545 n.4. And *Wilson* emphasized that its holding was a narrow one: the Court did not address "questions concerning legislative censures accompanied by punishments," — S. Ct. —, 2022 WL 867307, at \*6, nor did it address adverse actions such as "expulsion, exclusion, or any other form of punishment," *id.* at \*7. When considering those more serious forms of sanctions against elected officials, the Court has confirmed that they may qualify as material adverse actions. For example, when a state legislature blocked a duly elected state representative from taking office due to his statements criticizing the government's policy in Vietnam and the selective service laws, the elected official suffered a violation of his First Amendment rights. *See Bond v. Floyd*, 385 U.S. 116, 136–37 (1966). Similarly, *Wood* held that a state court violated the First Amendment when it used its contempt power to sanction an elected sheriff for his out-of-court statements criticizing a grand jury investigation into purported block voting by black citizens. *See Wood*, 370 U.S. at 392–93. In short, an adverse action against an elected official is material when it "prevent[s] [the elected official] from doing his job," *Wilson*, — S. Ct. —, 2022 WL 867307, at \*6, "deprive[s] him of authority he enjoyed by virtue of his popular election," or otherwise prevents him from enjoying "the full range of rights and prerogatives that came with having been publicly elected," *Blair*, 608 F.3d at 544 & n.4.

Finally, to establish the third prong of the prima facie case for First Amendment retaliation—which requires the plaintiff to show a causal relationship between the protected conduct and the material adverse action—the plaintiff must show that the "protected conduct played a part, substantial or otherwise," in the defendant's wrongdoing. *Nieves*, 139 S. Ct. at 1722 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977)). Such a causal

relationship may arise in a range of circumstances, such as when a government official suspends a regulated entity's permits because of the plaintiff's exercise of First Amendment rights, *see Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1312 (9th Cir. 1989), or when the government's termination of a contract with a government contractor is motivated by the contractor's speech on a matter of public concern, *see Umbehr*, 518 U.S. at 685. In many cases, "establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward," and courts may take "the evidence of the motive and the [defendant's wrongdoing] as sufficient for a circumstantial demonstration that the one caused the other." *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman*, 547 U.S. at 260). In assessing whether this causal element is met, courts have also given weight to circumstantial evidence such as a proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that the defendant proffered false or pretextual explanations for the adverse action. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1045 (9th Cir. 2017) (citing *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001)). In *Blair*, the third prong was met because it was undisputed that the plaintiff's criticism of the superintendent was the cause for the decision to remove him. *See* 608 F.3d at 543.

B

The Supreme Court (and our own case law) has adopted a burden-shifting approach to § 1983 claims of First Amendment retaliation, and that approach applies to elected

officials that have made a prima facie showing of retaliation.[3] Upon such a showing, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Hartman*, 547 U.S. at 260 (citing *Mt. Healthy*, 429 U.S. at 287). "If there is a finding that retaliation was not the but-for cause of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id.*

The Supreme Court has recently defined "but for" causation as being "established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020). "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* Under this test, if the outcome (the adverse action) would not have occurred without the government official's retaliatory animus, then that animus was a but-for cause of the adverse action. *See id.* Conversely, if the government officials would have taken the same adverse action even in the absence of their animus or retaliatory motive arising from the plaintiff's speech, then the officials' animus was not a but-for cause of the adverse action, and there was no violation of the plaintiff's constitutional rights. *See id.* "It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that

---

[3] We stopped our analysis in *Blair* after the plaintiff failed to show a material adverse action, and therefore failed to make a prima facie case of First Amendment retaliation. *See* 608 F.3d at 546.

action would have been taken anyway." *Hartman*, 547 U.S. at 260.

The Supreme Court has recognized that the causality inquiry can be complex in certain contexts. In the retaliatory arrest context, for example, the Court acknowledged that "it can be difficult to discern whether an arrest was caused by the officer's legitimate or illegitimate consideration of speech." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953 (2018). The Court has reasoned that "protected speech is often a wholly legitimate consideration when deciding whether to make an arrest" because "the content and manner of a suspect's speech may convey vital information—for example, if he is ready to cooperate or rather presents a continuing threat." *Nieves*, 139 S. Ct. at 1724 (cleaned up). In other words, protected speech (e.g., "I'm carrying a gun because police can't be trusted") may both convey information that requires an official to respond to a security threat, and also provoke an official's retaliatory animus.

Although *Nieves* considered this issue in the context of the plaintiff's prima facie case of retaliation, *see id.* at 1722, the Court's analysis is equally applicable to a defendant's affirmative defense. Thus, government officials do not violate a plaintiff's First Amendment rights if they had an objectively legitimate need to implement security measures in response to information conveyed by the plaintiff's speech, and would have implemented the same security measures in the absence of any retaliatory motive. In such a case, any unconstitutional motivation would not be a but-for cause of the officials' action. *See Bostock*, 140 S. Ct. at 1739.

C

We next address whether the framework that applies to evaluating speech restrictions that the government imposes on its employees also applies to restrictions on the speech of elected officials. We conclude it does not.

A modified First Amendment framework applies to claims of workplace-related retaliation for protected speech when the plaintiff is a government employee or contractor. *See Pickering*, 391 U.S. at 568 (government employee); *Umbehr*, 518 U.S. at 673 (government contractor); *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923–27 (9th Cir. 2004) (extending the approach used for government employees and contractors to government vendors). In such cases, the government has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. This is because "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Umbehr*, 518 U.S. at 676 (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)). In other words, when the government provides public services, it has a "job to do" and a heightened interest in doing that job effectively. *Waters*, 511 U.S. at 675.

In the employment-related context, a government employee or contractor's speech is protected from a material adverse action by government officials only if the speech

addresses a matter of public concern.[4] *See Connick v. Myers*, 461 U.S. 138, 146 (1983). The government can constitutionally restrict speech "that owes its existence to a public employee's professional responsibilities" because such a restriction "does not infringe any liberties the employee might have enjoyed as a private citizen," but "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006).

Even when a public employee speaks "as a citizen addressing a matter of public concern," *id.* at 423, the government can still defeat a § 1983 retaliation action if it shows that its "legitimate interests" as employer or contractor "outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 685. A court must balance the free speech rights of government employees against the government's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. This requirement is "based on the need to balance government employees' speech rights with the government's needs as an employer." *CarePartners*, 545 F.3d at 880.

The rationale for allowing the government to restrict the speech of government employees and contractors is not applicable to elected officials. Such elected officials are not speaking as employees of the government, nor does the

---

**[4]** "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quotation marks omitted).

government need to regulate their speech in order to deliver public services "effectively and efficiently" or to control "daily management functions." *Umbehr*, 518 U.S. at 678. An elected official's speech does not interfere with his performance of duties; to the contrary, the speech is a vital component of his duties because "[l]egislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them" and "may be represented in governmental debates by the person they have elected to represent them." *Bond*, 385 U.S. at 136–37. Elected officials therefore have "the right to enter the field of political controversy," and "[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves." *Wood*, 370 U.S. at 395–96; *see also id.* at 395 n. 21 (holding that the rule that "[C]ongress has the power to circumscribe the political activities of federal employees in the career public service" does not apply to elected officials).

In light of "[t]he manifest function of the First Amendment in a representative government" and the "require[ment] that legislators be given the widest latitude to express their views of policy," *Bond*, 385 U.S. at 135–36, we conclude that an elected official's speech is protected regardless whether the official is speaking "as a citizen upon a matter of public concern," *Garcetti*, 547 U.S. at 418; *cf. CarePartners*, 545 F.3d at 880–81 (holding that the "public concern" requirement does not apply to a plaintiff who is not in an employment-like relationship with the government). Nor does the *Pickering* balancing test apply to an elected official's claim of First Amendment retaliation by the official's elected peers. *See Phelan*, 235 F.3d at 1247 (declining to apply the *Pickering* balancing test to elected officials' retaliation claims); *see also Werkheiser v. Pocono*

*Twp.*, 780 F.3d 172, 178 (3rd Cir. 2015) (noting that "[m]any of the reasons for restrictions on employee speech appear to apply with much less force in the context of elected officials").

IV

We now apply the foregoing framework to Boquist's claim to determine whether his complaint stated a plausible First Amendment retaliation claim. Starting with the first prong for making a prima facie case, there is no doubt that Boquist's complaint raises a plausible inference that he was engaging in protected speech. The minority party senators' efforts to deprive the majority of the quorum needed to proceed with senate business, and the majority party senators' efforts to compel the minority senators to appear, was a purely political controversy that has occurred many times in the past.[5] The public was highly interested in this controversy, as confirmed by the news releases issued by the Governor and the Senate Majority Office addressing the situation, and the substantial media attention that it received. Boquist's rhetorical response to the majority's threat to use state police to arrest the departing senators and return them to the Capitol therefore fits easily within the wide latitude given

---

[5] *See* Charles E. Beggs, Associated Press, *Oregon Democrats Halt House Action* (June 26, 2001) (accessible at https://apnews.com/article/ba59cbad7051ffabb0e22b47695207f5); Ed Lavandera, CNN, *Texas House Paralyzed by Democratic walkout* (May 19, 2003) (accessible at https://www.cnn.com/2003 /ALLPOLITICS/05/13/texas.legislat ure/); Paul J. Weber & Will Weissert, Associated Press, *Texas Democrats leave state to try to stop GOP voting bill* (July 12, 2021) (accessible at https://apnews.com/article/government-and-politics-texas-votin g-voting-rights-7d9f2da74fb647b40214fa88ccdbcebb).

to elected officials "to express their views," *Bond*, 385 U.S. at 136, even when such political expressions are "vituperative, abusive, and inexact," *Watts v. United States*, 394 U.S. 705, 708 (1969).

The defendants argue that Boquist's statements are not protected by the First Amendment because they constitute unprotected fighting words or could be perceived as a threat. "Fighting words" are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942). At the motion to dismiss stage, we cannot say that Boquist's statements created a "likelihood that the person addressed would make an immediate violent response." *United States v. Poocha*, 259 F.3d 1077, 1080–81 (9th Cir. 2001). Boquist's statement to Courtney on the floor of the Senate—"if you send the state police to get me, Hell's coming to visit you personally"—was quickly followed by Boquist's public apology. And drawing all reasonable inferences in Boquist's favor, he was not likely to incite an immediate breach of the peace by informing a reporter that he had told the police to "[s]end bachelors and come heavily armed" because he was "not going to be a political prisoner in the state of Oregon." *See id.*

We likewise reject the defendants' argument that Boquist's complaint fails to state a First Amendment retaliation claim because his statements were unprotected threats. Only "true threats" fall outside the scope of First Amendment protection. *See Virginia v. Black*, 538 U.S. 343, 359 (2003). Under the "objective test" for determining when speech is a true threat, we ask "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a

serious expression of intent to harm or assault." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021) (quoting *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1074 (9th Cir. 2002) (en banc).**[6]** We must examine the speech in light of its "entire factual context, including the surrounding events and reaction of the listeners." *Corales v. Bennett*, 567 F.3d 554, 563–64 (9th Cir. 2009). "Even a statement that appears to threaten violence may not be a true threat if the context indicates that it only expressed political opposition or was emotionally charged rhetoric." *Kazal*, 13 F.4th at 746; *see also Watts*, 394 U.S. at 706–08 (holding that the defendant engaged in protected speech where he stated, "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J," during speech at Washington Monument opposing military draft); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902, 928 (1982) (holding that the statement "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck" at a rally was "emotionally charged rhetoric" protected under the First Amendment).

Taking the allegations in Boquist's complaint as true, and drawing all reasonable inferences in Boquist's favor, we cannot say that Boquist's statements were a "serious expression of an intent to commit an act of unlawful violence" against Courtney or the state police. *Black*,

---

**[6]** In criminal cases, in addition to applying an objective test, we apply a "subjective test" and ask whether the speaker subjectively intended to threaten violence. *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011). The speech must meet both tests in order to qualify as a "true threat." *Id.* We have left open the question whether the subjective test also applies in civil cases. *See Thunder Studios*, 13 F.4th at 746–47. We need not resolve that question here because, taking the allegations in Boquist's complaint as true, the objective test is not met.

538 U.S. at 359. Boquist alleged that he made his first statement only to convey that "Courtney's soul is now lost." And at least one reporter who observed Boquist's second statement interpreted it "as hyperbole, a response to a hypothetical event [Boquist] knew would never happen."[7] Because we cannot say it appears beyond doubt that Boquist "can prove no set of facts to support" his claims, *Adams*, 355 F.3d at 1183, his First Amendment retaliation claim survives a motion to dismiss. As the case proceeds through discovery, additional evidence regarding the nature of Boquist's statements may emerge that will have bearing on whether Boquist's statements were a serious expression of an intent to commit unlawful violence against Courtney or the state police, or merely political hyperbole.

Boquist also satisfies the second prong of the prima facie test because his complaint plausibly alleges that the 12-hour notice rule is a "materially adverse action." *Wilson*, — S. Ct. —, 2022 WL 867307, at *6. Following *Wilson*'s guidance, we first review "long settled and established" historical practices to determine if similar sanctions were traditionally a part of legislative action. *Id.* at *4. Our research reveals that, unlike censure, the exercise of the power to bar an elected official from the legislative chamber (whether temporarily or permanently) is not a "long exercised" means of responding to protected speech. *Id.* Legislatures have historically exercised the power to expel their members, as

---

[7] We are not faced with (and do not address) a situation where Boquist's second statement was directed at state police officers intending to detain Boquist and transport him to the State Capitol against his will. Indeed, at the time Boquist made his second statement on June 19, 2019, no state official had authorized or requested the state police to arrest absent senators.

well as to discipline them through the use of censures, reprimands, and fines. *See, e.g.*, Congressional Research Service, J. Maskell, *Expulsion, Censure, Reprimand, and Fine: Legislative Discipline in the House of Representatives* 3–9, 10–16 (2016) ("*Legislative Discipline*") (discussing the House of Representatives' ability to censure, reprimand, and fine its members).[8]  But we are aware of no case upholding the expulsion or exclusion of elected officials due to their protected speech.  To the contrary, the Supreme Court has held that a state legislature's refusal to seat an elected representative due to his statements criticizing the government's policy in Vietnam violated the official's First Amendment rights.  *See Bond*, 385 U.S. at 136–37.

Similarly, "[a]lthough a temporary suspension is traditionally listed as one of the possible disciplinary actions that a legislative body may take against one of its members," *see Legislative Discipline* at 15 (internal quotation marks omitted) (citing L. Cushing, *The Law and Practice of Legislative Assemblies* 251 (1874)), there is no evidence that such a sanction was regularly imposed, let alone imposed to punish protected speech.  In the few cases we have identified, a suspension sanction was imposed for acts of physical violence, such as when the Senate imposed a six-day suspension on two senators who physically assaulted one another on the Senate floor. *See Deschler's Precedents of the United States House of Representatives*, H. Doc. 94-661, 94th Cong., 2d Sess., Volume 3, Ch. 12, §15 at 168 (1979).  Currently, the prevailing view is that members of the

---

[8] From its inception, the House of Representatives has expelled only five members:  three for taking up arms against the Union during the Civil War, and two for bribery-related federal convictions.  *See Legislative Discipline* at 4, 21.

legislature do not have the power to suspend members and therefore deprive them of the right to vote. *See id.* at 187–92; *see also Legislative Discipline* at 15.   In short, while legislatures have historically exercised the power to censure elected officials, the historical record does not leave us with a "considerable impression" that imposing a 12-hour notice rule in response to protected speech is a well-established historical practice considered to be consistent with the First Amendment. *Wilson*, — S. Ct. —, 2022 WL 867307, at *5 (quoting *McCulloch v. State*, 17 U.S. (4 Wheat.) 316, 401 (1819)).

"[C]ontemporary doctrine," *id.*, confirms that the 12-hour notice rule is a materially adverse action.   Our circuit's approach "to distinguish material from immaterial adverse actions," *id.*, is to ask whether the government's conduct would "chill a person of ordinary firmness from continuing to engage in the protected activity," *Blair*, 608 F.3d at 543. But before applying the test, we must first take into account the key considerations applicable to an elected official's speech. *See Wilson*, — S. Ct. —, 2022 WL 867307, at *5. Those considerations again confirm that the 12-hour notice rule is a materially adverse action.  Although criticism alone is unlikely to be material, the 12-hour notice rule issued by Boquist's political opponents was not a mere exchange in "the give-and-take of the political process," *Blair*, 608 F.3d at 543, or a "rather minor indignity," *id.* at 544.   And the adverse action before us—the 12-hour notice rule—is not itself merely "a form of speech" from Boquist's opponents, or an expression of their political views. *Wilson*, — S. Ct. —, 2022 WL 867307, at *5. To the contrary, the 12-hour notice rule is a form of punishment which deprives Boquist of "authority he enjoyed by virtue of his popular election," *Blair*, 608 F.3d at 545 n.4, and "prevent[s] [Boquist] from

doing his job," *Wilson*, — S. Ct. —, 2022 WL 867307, at *6. The advance notice requirement "eliminates the possibility of spontaneous speech," including a senator's ability to immediately respond to and address a political issues arising on the floor of the Oregon state senate. *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019). Indeed, the 12-hour notice rule prevents Boquist from entering the Capitol for any purpose unless he gives twelve hours advance notice. Thus, the 12-hour notice rule "disproportionately burden[s] political speech that must respond to changing current events." *Id.*; *see also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) ("[T]iming is of the essence in politics . . . [and] it is often necessary to have one's voice heard promptly, if it is to be considered at all."); *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984) ("[A]ll advance notice requirements tend to inhibit speech. The simple knowledge that one must inform the government of his desire to speak . . . discourages citizens from speaking freely.").

The 12-hour notice rule therefore prevents Boquist from exercising "authority he enjoyed by virtue of his popular election," *Blair*, 608 F.3d at 545 n.4, namely, having timely access to the physical seat of government where "governmental debates" take place, *Bond*, 385 U.S. at 136; *see also Republican Party of Minnesota v. White*, 536 U.S. 765, 788 (2002) (explaining that states must accord participants in the democratic process "the First Amendment rights that attach to their roles"). The rule likewise interferes with Boquist's ability to meet with constituents, elected officials, and others at the State Capitol Building on short notice, and therefore "prevent[s] [Boquist] from doing his job." *Wilson*, — S. Ct. —, 2022 WL 867307, at *6. These

significant burdens would "chill a person of ordinary firmness from continuing to engage in the protected activity." *Blair*, 608 F.3d at 543. Accordingly, the allegations in Boquist's complaint raise a plausible inference that the defendants engaged in retaliatory conduct that qualifies as a "materially adverse action." *Id.*

Finally, Boquist's complaint meets the third prong of the prima facie test. Prozanski's statements to Boquist in his office, and those before the Senate Special Committee on Conduct, make clear that the Special Committee imposed the 12-hour notice rule in response to Boquist's protected speech. Therefore, Boquist's complaint plausibly alleges that his speech "played a part, substantial or otherwise," in the retaliation. *Nieves*, 139 S. Ct. at 1722 (quoting *Mt. Healthy*, 429 U.S. at 285).

The defendants raise several arguments to the contrary, but each of them fail. First, the defendants argue that Boquist failed to state a claim because his allegations are mere legal conclusions, not facts. We disagree. Although a complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient to withstand a motion to dismiss, *Iqbal*, 556 U.S. at 678, Boquist's complaint does not contain mere legal conclusions. Rather, Boquist pleaded specific facts regarding background incidents in the months preceding the issuance of the 12-hour notice, events surrounding Boquist's protected speech, and Prozanski's statements both in Boquist's office and during the Special Committee's hearing. These factual allegations alone are sufficient to raise a plausible inference that the 12-hour notice rule was a response to Boquist's protected speech.

Second, the defendants argue that Boquist's complaint fails to state a claim because the 12-hour rule was "a reasonable response to perceived threats." In other words, defendants rely on an affirmative defense: they had a non-retaliatory motive (a legitimate need to implement security measures) for the 12-hour notice rule. But that affirmative defense is grounds to dismiss Boquist's claim only if his complaint, on its face, "admits all the ingredients" of the defense. *Durnford*, 907 F.3d at 603 n.8.

Here, the defendants' affirmative defense is not apparent from the complaint, which described merely an exchange of heightened rhetoric to demonstrate political opposition. According to the allegations in the complaint, Boquist's two remarks were even less inflammatory than those in *Watts*, where a protester's statement, "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.," was deemed to be protected by the First Amendment. 394 U.S. at 708. On remand, defendants are free to raise the affirmative defense that, in instituting the 12-hour notice rule, they were motivated by "vital information" conveyed by Boquist's speech, *Nieves*, 139 S. Ct. at 1724, that raised an objectively legitimate need to implement security measures and that justified the particular measures they chose, *see Hartman*, 547 U.S. at 256. Evidence that defendants were motivated by legitimate safety concerns that warranted the 12-hour notice rule, such as evidence that other state senators expressed concerns about their safety in response to Boquist's statements, may allow defendants to prevail on their theory that an unconstitutional motivation was not the but-for cause of the adverse action. *See Bostock*, 140 S. Ct. at 1739. If defendants are able to show that retaliation was not a but-for cause of the rule, the 12-hour notice rule would not violate Boquist's First Amendment rights because it would not

constitute retaliation for his protected speech. In those circumstances, Boquist would not be entitled to declaratory relief based on a theory of illegal retaliation. But the defendants' affirmative defense is not apparent as a matter of law from the face of the complaint and is therefore not grounds for dismissal at the pleading stage. *See Durnford*, 907 F.3d at 603 n.8.

Finally, the defendants assert that Boquist's complaint fails to state a claim because the 12-hour notice rule is a reasonable time, place, and manner restriction. This argument misses the point. The government is barred from taking actions "designed to retaliate against and chill political expression," *Gibson*, 781 F.2d at 1338, even when that action could be taken lawfully in the absence of such improper motivation. For instance, a court has authority to impose sanctions for contempt, but cannot do so to punish an elected official for protected speech, *see Wood*, 370 U.S. at 383, and a government employer can fire an employee, but not on account of protected speech absent legitimate counterbalancing concerns, *see Pickering*, 391 U.S. at 568. Therefore, even assuming that a 12-hour notice requirement was constitutional as a reasonable time, place, and manner restriction, the defendants could not impose that requirement on Boquist out of a retaliatory animus, as plausibly alleged in the complaint.

**REVERSED IN PART AND REMANDED.[9]**

---

[9] Each party will bear its own costs on appeal.