*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

NANCY ANN GERWATOWSKI,

      Defendant-Appellant.

FOR PUBLICATION
February 04, 2026
11:17 AM

No. 374157
Mackinac Circuit Court
LC No. 22-004294-FC

Before: WALLACE, P.J., and RIORDAN and REDFORD, JJ.

WALLACE, P.J. (*concurring in part and dissenting in part*).

As stated in the majority opinion, defendant is charged with the open murder and involuntary manslaughter of Baby Garnet. This interlocutory appeal *does not* address the substantive merits of those charges or the implications of defendant's conduct during and after giving birth. Rather, this appeal is narrowly limited to the admissibility of statements she made to two police officers including confessing to being Baby Garnet's mother, disposing of the infant's body, and other conduct during the pregnancy, as described later in this opinion. For the reasons discussed below, I agree with the trial court's determination that defendant's confession at her second interview followed a valid waiver of her Fifth Amendment rights. However, I disagree that statements made in her first interview with police are admissible, and I disagree with the trial court's determination that two matters defendant disclosed to law enforcement are admissible under the Michigan Court Rules.

Therefore, I concur with the majority's finding that certain statements made by defendant in her second interview with police, i.e., her confession, are admissible in this case because she was not in custody at the time of her confession. However, because defendant was in custody at the time of her first interview with police, I respectfully dissent from the majority's finding that statements made in defendant's first interview are admissible. Also, because the statements that she did not obtain prenatal care are irrelevant to the issues in this matter, such evidence should be suppressed because it does not meet the requirements of MRE 401. To the extent that such evidence can be argued to have some marginal relevance to any issue in this case, I would find that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice under MRE 403. With regard to the issue of defendant having previously considered

getting an abortion, I would likewise hold that any marginal relevance of that evidence is even more substantially outweighed by the danger of unfair prejudice under MRE 403 than the statements regarding lack of prenatal care. As a result, I respectfully dissent from the majority opinion's finding that such evidence is admissible.

## I. BACKGROUND FACTS

As indicated in the majority opinion, approximately 25 years after Baby Garnet's remains were found, two Michigan law enforcement officers made use of recent advances in DNA technology to identify defendant as the probable mother. They traveled to defendant's home state of Wyoming and, along with two local officers, appeared at defendant's home and asked her to come to the local sheriff's office to discuss an investigation that they did not identify. Defendant invited the officers inside her home, and they then informed her that they knew she was Baby Garnet's mother. They additionally stated that there were two categories of people in her situation, those who had made a bad decision and was those who were monsters. They asked her to agree that she was Baby Garnet's mother. Defendant initially refused to say anything and was reluctant to go with the officers to the sheriff's office, citing her need to have her son care for her dog. She asked the officers if she had a choice and the officers refused to answer her question. Instead, they reiterated that they wanted defendant to tell her story, and they refused to let her contact her son until she knew whether she would join them. Defendant expressed the belief that she had no choice, which the officers denied, but they told her there was a "part two" or a "flip side." When defendant asked them to explain, they again refused, told her that she was "not the one in the driver's seat," and again asked her if she would come with them. They eventually told her that she had a legal right to refuse, and they let her bring her dog into the house. When she asked to be allowed to go to another room to put on pants, they refused to allow her to leave their presence, and followed her to the other room, where she put on a pair of pants. They also would not allow her to take her purse until they first searched it. They then transported her to the sheriff's office.

At the station, after being read her *Miranda*[1] rights, defendant stated that she understood her rights and did not wish to speak. As explained in the majority opinion, when defendant asked about whether there was an attorney for her, the officers told her she was not entitled to a court-appointed attorney until she was arrested. After officers executed a search warrant to obtain her DNA, defendant was taken home.

A few hours later, defendant reached out to speak to the officers and was brought back to the sheriff's office. After the officers again read defendant's *Miranda* rights to her, told her that she did not need to speak, and invited her to tell them about Baby Garnet, the following conversation occurred:

> Defendant: Okay. Then I do have a question in how come I couldn't have an attorney present.
>
> Umbarger: We don't bring attorneys with us. That's your--

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Defendant: Okay.

Umbarger: Responsibility. You know, and I think Det. Demers gave you that explanation.

Defendant: Yeah.

Umbarger: You get--you get granted one through the court process. We're not there--you're not under arrest.

Defendant: No, I understand that.

Umbarger: Yeah, so--so until we get to that point, you know [inaudible] he could've come today as far as I--I don't know, right, it's attorney-client privilege. You may have gone home and spoke to three attorneys today. I don't know.

Defendant: No, I didn't speak to--

Umbarger: I don't know, but it's within your rights.

Demers: Yeah. Okay. So then, again, are you willing to give up these rights and answer my questions at this time, if we have any questions to follow up with after--after you talk?

Defendant: I guess, yeah.

As detailed in the majority opinion, defendant admitted during the second interview that she was Baby Garnet's mother and explained various details related to her pregnancy, including the fact that she had thought about getting an abortion. She admitted to having given birth to the infant under the circumstances described in the majority opinion and was subsequently arrested.

## II. ADMISSIBILITY OF DEFENDANT'S CONFESSION

Defendant first argues that her confession should be excluded because it was obtained in violation of her Fifth Amendment rights. While I agree that anything she said while in her home should be excluded because she was subjected to a custodial interrogation without the benefit of *Miranda* warnings, her eventual confession during the second interview at the sheriff's office was valid and is admissible.

If the police interrogate a person who is in custody, the police must inform the person of their *Miranda* rights. *People v Clark*, 330 Mich App 392, 415-416; 948 NW2d 604 (2019). A person is "in custody" if the objective circumstances would make a reasonable person feel that "he or she was not at liberty to terminate the interrogation and leave." *People v Barritt*, 325 Mich App 556, 562; 926 NW2d 811 (2018) (quotation marks and citation omitted). The relevant circumstances to be considered are

(1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical

-3-

restraints during the questioning; and (5) the release of the interviewee at the end of the questioning. [*Id.* at 562-563 (ellipses and citations omitted).]

"[N]o one circumstance is controlling; rather, a reviewing [c]ourt must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation . . . ." *Id.* at 563.

## A. INTERVIEW AT HOME AND FIRST INTERVIEW AT THE POLICE STATION

Usually, an interview in a person's own home is regarded as noncustodial. *People v Coomer*, 245 Mich App 206, 220; 627 NW2d 612 (2001). However, the location of an interview is not dispositive. *Barritt*, 325 Mich App at 562-569. Here, there is no evidence that the officers ever displayed any weapons or threatened defendant, and none of her interviews were lengthy. However, during the interview in defendant's home, she was alone and surrounded by four law enforcement officers who refused to let defendant call her son. Such "isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support" and can contribute to the individual feeling not at liberty to remain silent or end an interview. *Howes v Fields*, 565 US 499, 512-513; 132 S Ct 1181; 182 L Ed 2d 17 (2012). Here, the officers were accusatory, which weighs in favor of finding that defendant was in custody. *Barritt*, 325 Mich App at 573. The officers eventually told defendant that she could refuse to come with them, but only after initially refusing to answer whether she had a choice and telling her that she was not "in the driver's seat." More importantly, after making that statement, police then refused to allow defendant to go by herself to another room to put on a pair of pants, instead insisting that she be accompanied. When she said she was going to get her purse, they refused to allow her to bring the purse unless they searched it first. Their conduct, which communicated that defendant had no real choice, speaks louder than their words. Cf. *People v Swilley*, 504 Mich 350, 390-392; 934 NW2d 771 (2019) (finding prejudicial effect of bias displayed by trial judge throughout the trial was not overcome by curative instruction where "the judge's words repeatedly conflicted with his actions").

Finally, coercion can be psychological. *People v Stewart*, 512 Mich 472, 480-481; 999 NW2d 717 (2023). The officers arrived unannounced, refused to answer defendant's questions, and repeatedly demanded that she decide what to do immediately and without letting her contact her son. In other contexts, demanding an immediate decision has been recognized as coercive or stressful. *Payne v Cavanaugh*, 292 Mich 305, 308; 290 NW 807 (1940) (finding no duress where party to a contract had "ample time and opportunity for investigation, consideration, consultation, and reflection"); *Kosch v Traverse City Area Pub Sch*, ___ Mich App ___, ___, ___; ___ NW3d ___ (2024) (Docket No. 364955); slip op at 10, 12 (failing to provide a reasonable amount of time to choose whether to resign is relevant to whether the resignation was involuntary); *Tennessee Secondary Sch Athletic Ass'n v Brentwood Academy*, 551 US 291, 297-299; 127 S Ct 2489; 168 L Ed 2d 166 (2007) (noting that the prospect of pressuring a potential client or student for an immediate response is one reason why the First Amendment permits states to regulate in-person solicitation of clients by attorneys and solicitation of eighth-grade students for sports teams by coaches). Law enforcement officers surprising a suspect and demanding an immediate decision whether to confess, especially when the officers know that the defendant has no experience with law enforcement, is similarly coercive.

Considering all of the factors from *Barritt*, and the totality of the circumstances in this case, I would find that an ordinary reasonable person, surrounded by four police officers in her home, accused of a serious crime, told she was not allowed to call a family member, and that she was not free to go into another room to get dressed by herself, would feel that she was not free to terminate the interrogation and leave. *Barritt*, 325 Mich App at 562. The fact that the person, when preparing to leave, was not even permitted to bring her purse without it first being searched by police would bolster that belief. Thus, I would hold that the trial court erred by finding that defendant was not in custody during the interview in her home.

Defendant was also in custody during her first interview at the sheriff's office. Having been removed from her home, after first having her purse searched, and taken to a police station by the local detectives weighs heavily in favor of a finding of being in custody for *Miranda* purposes. *Barritt*, 325 Mich App at 565-566. Even presuming the door to the interview room was unlocked, the officers sat between defendant and the door, *id*. at 567-568, and they never told her that it was unlocked or that she could leave, *id*. at 570. A reasonable person would not have believed he or she was at liberty to end the interview and leave. Nevertheless, defendant invoked her rights, the officers honored that invocation of her rights, and defendant arguably said nothing incriminating.

## B. SECOND INTERVIEW AND CONFESSION

I agree with the majority that defendant voluntarily reinitiated contact with police, hours after they returned defendant to her home. I further agree with the majority's determination that police gave defendant an erroneously limited explanation of the extent of her right to counsel under the Fifth Amendment when it told her she was not entitled to appointed counsel for the purposes of questioning.

However, in contrast to her first two interactions with the officers, defendant was not in custody the second time she was at the sheriff's office, considering the totality of the circumstances. *Barritt*, 325 Mich App at 563. Thus, I agree with the majority's holding that the officers did not need to provide defendant with *Miranda* warnings prior to her confession during the second interview, meaning that their flawed *Miranda* warnings did not violate defendant's Fifth Amendment rights.

In summary, although I believe any statements defendant made in her home or during her first interview at the station should be excluded, I believe that the trial court correctly declined to exclude defendant's confession in its entirety.

## III. EVIDENCE OF SPECIFIC CONDUCT DURING DEFENDANT'S PREGNANCY

I disagree with the majority's holding that defendant's statements that she did not obtain prenatal care are relevant to issues in this case under MRE 401. But, even if such evidence was marginally relevant, I would hold that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice under MRE 403. With regard to defendant's statement concerning her having considered getting an abortion, unlike the majority I would hold that the statement is inadmissible because any arguable relevance is even more substantially outweighed by a danger of unfair prejudice than the statements regarding prenatal care.

The threshold for relevance, and therefore admissibility, under MRE 401 is minimal. *People v Crawford*, 458 Mich 376, 389-390; 582 NW2d 785 (1998). "Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). Evidence amounting to nothing more than speculation is irrelevant and therefore inadmissible. *People v McFarlane*, 325 Mich App 507, 529-530; 926 NW2d 339 (2018); *Unger*, 278 Mich App at 248-249; *People v McCracken*, 172 Mich App 94, 97-99; 431 NW2d 840 (1988). Proof beyond a reasonable doubt may be established by circumstantial evidence, "but the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020) (quotation marks and citation omitted). "[F]or a causation theory to be raised from the realm of the possible to the probable, there must be evidence in the record that provides a basis for the trier of fact to reasonably infer that such a theory is not only possible, but probable." *People v Burton*, 252 Mich App 130, 144-145; 651 NW2d 143 (2002), citing *Skinner v Square D Co*, 445 Mich 153, 164-165; 516 NW2d 475 (1994).

Evidence is inadmissible under MRE 403 if its probative value is substantially outweighed by a danger of unfair prejudice. All relevant evidence offered against a party will obviously be prejudicial to some extent. *People v Fisher*, 449 Mich 441, 451; 537 NW2d 577 (1995). It is only *unfairly* prejudicial if it tends to inject "considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock" or if "there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Thurmond*, 348 Mich App 715, 730-731; 20 NW3d 311 (2023) (quotation marks and citations omitted). Evidence of other conduct is admissible under MRE 404(b) if it is truly "probative of something *other* than the defendant's propensity to commit the crime." *Crawford*, 458 Mich at 390. Although a chain of inferences upon inferences is permissible, *People v Hardiman*, 466 Mich 417, 427-428; 646 NW2d 158 (2002), that chain may not depend upon or be employed to create an impermissible character inference, *People v Denson*, 500 Mich 385, 407-408; 902 NW2d 306 (2017).

## A.  LACK OF PRENATAL CARE

I first observe that the prosecution misrepresents defendant's statements by saying that defendant *chose* not to obtain any prenatal care or *refused* to obtain prenatal care. Her statements only establish that she *did not* obtain prenatal care, and they strongly suggest that she had little practical ability to obtain prenatal care or was simply paralyzed by indecision. There is a right to refuse medical treatment. *In re Martin*, 450 Mich 204, 216-217; 538 NW2d 399 (1995). It is also a matter of common knowledge that many people forgo medical care for many reasons, including simple neglect, distrust of doctors, or lack of access to transportation.

The trial court relied on an unpublished Maryland Court of Appeals case that was subsequently overturned by that state's supreme court. The Maryland Supreme Court observed that "the unfortunate reality is that forgoing obstetrical care is not uncommon," often because it is simply not available, and that the failure to obtain prenatal care may elicit improper biases. *Akers v State*, 490 Md 1, 48; 331 A3d 853 (2025). Similar to our state's jurisprudence, evidence that requires "a speculative chain of inferences" lacks probative value and is irrelevant in Maryland. *Id*. at 26-27. The *Akers* Court held that, by itself, "[i]t is too ambiguous, speculative, and equivocal to infer that a woman who foregoes prenatal care while pregnant is more likely to kill or harm a

live human being." *Id*. at 48-49. I agree. Defendant had no obligation to obtain prenatal care, could plausibly have had no ability to obtain prenatal care, and might have foregone prenatal care for any number of reasons—none of which are more likely than any other. Yet, evidence of failing to obtain prenatal care is likely to result in a jury giving undue weight to impermissible speculation that defendant formed the *mens rea* for one of the charged crimes. *Burton*, 252 Mich App at 144-145; *Thurmond*, 348 Mich App at 730-731. The fact that defendant did not obtain prenatal care is equally consistent with a variety of other potential explanations such as panic-induced paralysis, lack of access to transportation or health insurance, or disliking the available doctor. It is not relevant to any material fact under MRE 401, and it is speculative and therefore inadmissible under MRE 402. Further, any conceivable probative value is substantially outweighed by a danger of unfair prejudice. MRE 403. The trial court abused its discretion by failing to exclude the evidence that defendant did not obtain prenatal care.

## B. CONSIDERATION OF ABORTION

The prosecution also argues that evidence that defendant contemplated an abortion is probative of her motive, state of mind, and intent to kill Baby Garnet.

This Court has held that the "existing strong and opposing attitudes concerning the issue of abortion clearly make any reference thereto potentially very prejudicial," rendering such evidence inadmissible when it had only marginal probative value. *People v Morris*, 92 Mich App 747, 750-751; 285 NW2d 446 (1979).[2] Our Supreme Court has held that evidence that a person obtained an abortion "is not so inherently prejudicial in today's society as to render it inadmissible." *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018). However, in *Sharpe*, the victim's pregnancy and abortion were *highly* relevant to whether the defendant assaulted the victim, and our Supreme Court recognized that the evidence had potential for unduly swaying the jury. *Id*. at 331-334. Thus, *Sharpe* does not conflict with *Morris*. Everyday experience shows that the issue of abortion remains impactful and emotional. It carries a high potential for significant unfair prejudice, so its probative value must be more than marginal.

In this case, the prosecutor will have to present evidence to establish that defendant had the requisite *mens rea* for first-degree murder, second-degree murder, or manslaughter. Because of the strong views prevalent on this issue, there is a substantial danger that jurors will give undue or preemptive weight to the otherwise marginally relevant evidence that defendant contemplated having an abortion when considering whether she had the requisite *mens rea* for one of these crimes. *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). Contrary to the trial court's determination, it is also not clear that the parties would be able to safeguard defendant's rights through voir dire and a jury instruction on the proper inferences to be drawn.

---

[2] The defendant's murder conviction in *Morris* was overturned, in part, due to the admission of evidence that she had previously undergone abortions. Balancing the two factors in MRE 403, this Court found that the evidence weighed "heavily towards prejudice with a minimum of probative value." *Morris* 92 Mich App at 751.

Multiple jurisdictions have squarely rejected the proposition that evidence of a mother considering an abortion or previously obtaining an abortion is relevant to a prosecution against a mother for murdering her child. *People v Ege*, unpublished per curiam opinion of the Court of Appeals, issued September 17, 1996 (Docket No. 173448), p 20; *Akers*, 490 Md at 38-40; *Stephenson v State*, 31 So 3d 847, 851 (Fla App, 2010); *People v Ehlert*, 274 Ill App 3d 1026, 1034-1035; 654 NE2d 705 (1995).[3]

Once again, the trial court in the present case relied upon the Maryland Court of Appeals decision in *Akers*, in which the defendant was convicted of child abuse and murder after she delivered a baby at home. The defendant told first responders that she was not pregnant when they arrived to help her with severe vaginal bleeding. She later admitted to medical professionals that she had delivered a baby, but she claimed that the baby was not alive when born. She told the medical personnel that she put the baby in a bag and placed it in a closet. *Akers*, unpublished opinion of the Maryland Court of Appeals, issued January 30, 2024 (Case No. C-13-CR-19-000367), p 1. On appeal, the Maryland Court of Appeals found that evidence demonstrating the defendant searched the internet about abortions was relevant because there was other evidence that the defendant wanted to conceal the pregnancy. It determined that the evidence that the defendant searched for information on abortions was relevant to show that she was more likely to kill her baby immediately after birth to help conceal her pregnancy. *Id*. at 10-13. But the Maryland Supreme Court reversed the appellate decision and remanded the case for a new trial. *Akers*, 490 Md at 50. It held that the evidence that the defendant had searched for information about procuring an abortion months earlier was not relevant to show the defendant's intent to kill:

> Simply put, the predicate fact—*lawfully contemplating the termination of a pregnancy*—does not support the inferences advanced by the State—*an intent, plan, or motive to kill or harm a person*. The State's argument begs the question of how Ms. Akers' internet searches made it more likely that she had a homicidal intent toward a living newborn, unless one assumes that a person who researches abortion options is more likely to commit murder or harm a person. [*Id*. at 38-39.]

The Maryland Supreme Court also did not agree that the searches were relevant to establish second-degree murder or child abuse. It explained that the chain of inferences was "too speculative, ambiguous, and equivocal to support an inference that [the defendant] had the specific intent to kill or harm a live baby, or even that she generally did 'not have a plan' if the baby was born alive, simply because she researched abortion options many months prior to delivery." *Id*. at 40. It also held that the evidence was not relevant to challenge the defendant's credibility because

---

[3] *Bynum v Arkansas*, 2018 Ark App 201; 546 SW3d 533 (2018), is also notable. Although the defendant in that case arising from a stillborn birth was not charged with murder, she was convicted by a jury of concealing a birth in violation of Arkansas law after just four minutes of deliberation. The Arkansas Court of Appeals held that evidence of prior abortions by the defendant, as well of evidence of her ingestion of pharmaceutical drugs prior to delivery, were not relevant to the issue of whether she concealed the birth, and that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *Bynum*, 2018 Ark App 201 at 13-14.

a months' earlier search did not make it less likely that she intended to deliver the child and give it to a safe haven. *Id*. at 44.

Unlike the majority, I find that the present case is factually indistinguishable from *Akers*, in which the Supreme Court of Maryland found that a defendant's having considered an abortion many months prior to the birth of the child is not relevant to any issue in a murder case. But, to the extent that defendant's consideration of abortion months prior might arguably have some marginal logical relevance, its probative value is substantially outweighed by a danger of unfair prejudice. See *Morris*, 92 Mich App at 750-751; MRE 403. Thus, I respectfully dissent from the majority opinion's holding on this issue and would hold that the trial court abused its discretion in failing to exclude this evidence.

/s/ Randy J. Wallace